**UNITED STATES of America ex rel.
Harry E. CAREY**

v.

**A. T. RUNDLE, Supt., Appellant.**

**No. 17564.**

United States Court of Appeals
Third Circuit.

Argued Feb. 18, 1969.

Decided April 18, 1969.

Roger F. Cox, Asst. Dist. Atty., Philadelphia, Pa. (James D. Crawford, Asst. Dist. Atty., Chief, Appeals Div., Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., Philadelphia, Pa., on the brief), for appellant.

Richard S. Seltzer, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee.

Before VAN DUSEN, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

In this case we come to grips with a familiar phrase: "every defendant in a criminal proceeding is entitled to have counsel of his own choice". This is a lay expression, albeit often articulated by those trained in the law [1] as a paraphrase of the Sixth Amendment: "In all criminal prosecutions, the accused shall * * have the Assistance of Counsel for his defense."

We must decide whether the Sixth and Fourteenth Amendments command an absolute right to a particular counsel for a particular trial at a particular time.

The relator was arrested on June 2, 1966, and appeared at a preliminary hearing on June 4, at which time he was represented by private counsel. After he was indicted by the grand jury, his case came on for trial on August 29, at which time the Commonwealth appeared with its witnesses and was prepared to go to trial. The defendant, however, reported that he could not proceed because he did not have counsel.

Upon ascertaining that the defendant had been represented by Attorney A. Charles Peruto at the preliminary hearing, the court summoned Mr. Peruto to the courtroom. The attorney reported that although he had represented the defendant at the preliminary hearing, he had entered no appearance as counsel for the defendant in the court proceedings. He stated unequivocally that he did not represent the defendant and that he had

---

1. Relator's brief. See also Gomez v. Heard, 218 F.Supp. 228 (S.D.Tex.1962).

no intention of doing so. Because of the defendant's insistence that he desired private counsel, the court postponed the trial until September 28 to afford him an additional thirty days to obtain counsel of his choice. At the same time the court ordered the Voluntary Defender to file an appearance for the defendant and to be ready to proceed on the September date in the event the defendant was not successful in his attempt to retain private counsel.

The appointed day came and the case was called for trial. The Commonwealth again was ready to proceed. Still without private counsel but represented by the Voluntary Defender, the defendant requested a continuance of one day to obtain notes of the testimony adduced at the preliminary hearing. Two days passed. On September 30, the case was again called, at which time the Commonwealth was ready to proceed for the third time. Speaking through the Voluntary Defender, the defendant again requested a continuance, stating that he did not desire representation by the Voluntary Defender and insisted upon retaining private counsel. The motion was denied; the court ordered the Voluntary Defender to sit with the defendant at counsel table and the trial began.[2] Thereupon, the defendant elected to proceed non-jury.

At the noon recess, Attorney Milton Leidner appeared in the courtroom and informed the court: "The mother of Harry Carey was at my office and as a result of conversation I told her I would enter my appearance and represent him. I subsequently went on trial and in my absence she did bring a check into the office and it is a good check." He said that he had not filed his appearance, but he was prepared to do so: "If the case is continued, yes. I cannot try it now. I am already on trial." The court then announced that "this case is continued until Monday morning at 10 A.M." Mr. Leidner interjected that he had another case listed for the same day. The court refused to continue the trial any later than Monday. Mr. Leidner then said, "I will withdraw my appearance and refund the retainer which I didn't receive but only placed it in my drawer." The trial then proceeded to a conclusion; the defendant was found guilty.

After exhausting state remedies, Carey filed a petition for federal habeas corpus relief alleging a denial of due process. The writ was granted and the Commonwealth has appealed.

■ We begin with the premise that the right to counsel is a vital ingredient in the scheme of due process, tracing its paternity to the landmark case of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77

2. The Voluntary Defender advised the court on September 30:

"When I spoke to the defendant this morning he again informed me he didn't wish to be represented by myself or by anyone from our office and that he wishes to be represented by his own private counsel and that he was able to afford private counsel and presently is trying to contact Mr. Milton Leidner and arrange for the representation by Mr. Leidner."

The defendant was asked by the court:

"When did you first make any effort to contact Mr. Leidner?"

ANSWER:

"Wednesday (September 28) when they brought me here to court, I was informed at that particular time that I didn't have Mr. Leidner and that the Voluntary Defender was to represent me. There is some misunderstanding, I have other cases

pending and I wanted one lawyer to handle all my cases."

The defendant then stated to the court:

"At that particular time, it was Wednesday, I was unaware of that procedure. I had been informed that the man (Attorney Peruto) would be at my trial."

The Assistant District Attorney then reported to the court:

"I was present when Mr. (A. Charles) Peruto was present before Judge Weinrott back in August, and he stated he did not represent the man.

"I only called his office in case he had been retained since then. There had been no attempt made. The secretary to Mr. Peruto says he does not represent him."

The Voluntary Defender reported to the court that the defendant had refused to be interviewed by her office during the appropriate interim.

L.Ed. 158 (1932), which held that the Sixth Amendment right to the assistance of counsel was one of the fundamental rights guaranteed by the due process clause of the Fourteenth Amendment, and therefore extended to those accused of state offenses, at least in capital cases.

Even before Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) extended this protection to a broader class of state defendants, there had begun a process of judicial refinement of a concept that the representation of counsel, *per se,* would not necessarily satisfy all the requirements of due process. Thus, in Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1962), the Court held that representation of co-defendants by otherwise competent counsel in the face of information that the interests of the defendants might be in conflict, would not satisfy Sixth Amendment requirements.

A tangential reference to the quality of legal assistance was made by the Supreme Court in Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). In that case, counsel had advised his client that an appeal following conviction would be fruitless. Emphasizing the necessity that indigent defendants who rely upon appointed counsel must be afforded the same protection as "the rich man", the Court said: "The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of *amicus curiae."* 386 U.S. at 744, 87 S.Ct. at 1400.

■ To insure more than perfunctory compliance with this constitutional mandate, the federal courts have exhibited a willingness to examine the effectiveness of counsel, where it is genuinely in issue. Although the decisions articulate no precise mechanical standards, proceeding of necessity on a case-by-case method, it is generally held that a constitutional question is presented if counsel's performance was so incompetent or negligent as to constitute the proceedings a farce or mockery of justice shocking to the conscience of the court.[3]

■ A necessary predicate of the concept of effective assistance is the requirement that there be adequate time for counsel to prepare as well as to direct the defense. This court has recently ruled that the belated appointment of counsel is inherently prejudicial and this fact alone makes out a prima facie case of a denial of effective counsel.[4]

Thus we observe the reach of the Sixth and Fourteenth Amendments extending from the bare recognition of the right to counsel to a critical evaluation of the quality and effectiveness of the assistance afforded. We recognize the force generating this growth to be a deliberate and studied application of expanded notions of fundamental fairness as embodied in the Fourteenth Amendment. We also witness a simultaneous burgeoning of the distinction between technical "representation" by counsel and meaningful "assistance" of counsel.

Concurrently a doctrine has evolved which guarantees the defendant suffi-

3. In United States v. Cariola, 323 F.2d 180 (3 Cir. 1963) we said (at page 185, footnote 4):
   "The services of counsel meet the requirement of due process when he is a member in good standing at the bar, gives his client his complete loyalty, serves him in good faith to the best of his ability, and his service is of such character as to preserve the essential integrity of the proceedings at a trial in a court of justice. Only when the representation of an attorney is so lacking in competence or good faith that it be-

   comes the duty of the trial judge or prosecutor as officers of the state to observe and correct it, is there a denial of due process. United States ex rel. Darcy v. Handy, 203 F.2d 407, 427 (3 Cir. 1953)."
   See cases collected in Cardarella v. United States, 375 F.2d 222 at 230 (8 Cir. 1967).

4. United States ex rel. Mathis v. Rundle, 394 F.2d 748 (3 Cir. 1968); United States ex rel. Chambers v. Maroney, 408 F.2d 1186 (3 Cir. 1969).

cient time and opportunity to obtain counsel of his own choice.

In Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954), the defendant was brought to trial on the same day for two separate offenses. He waived counsel in both. When a third offense was unexpectedly listed, carrying with it serious penalties under the state's Habitual Criminal Act, the defendant requested a continuance for the purpose of obtaining counsel. The request was denied, and following conviction, the Supreme Court reversed, stating:

"[A] defendant must be given a reasonable opportunity to employ and consult with counsel; otherwise, the right to be heard by counsel would be of little worth. * * * By denying petitioner any opportunity whatever to obtain counsel on the habitual criminal accusation, the trial court deprived him of due process of law as guaranteed by the Fourteenth Amendment." 348 U.S. 10, 75 S.Ct. 5.

But in Unger v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1963), after two short continuances were granted to allow a second lawyer to appear for the defendant, the attorney requested an additional week to familiarize himself with the case. This request was denied, and the Supreme Court found no denial of due process, stating:

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. * * * There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due proc-

ess. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request was denied." 376 U.S. at 589, 84 S.Ct. at 849.[5]

██ Desirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of criminal justice. The calendar control of modern criminal court dockets, especially in metropolitan communities, is a sophisticated operation constantly buffeted by conflicting forces. The accused's rights—such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, and to confront witnesses—are constantly in potential or real conflict with the prosecution's legitimate demands for some stability in the scheduling of cases. The availability of prosecution witnesses is often critically dependent on the predictability of the trial list. That delays and postponements only increase the reluctance of witnesses to appear in court, especially in criminal matters, is a phenomenon which scarcely needs elucidation.

Moreover, it is not only the prosecution which may suffer from unscheduled changes in the calendar. To permit a continuance to accommodate one defendant may in itself prejudice the rights of another defendant whose trial is delayed because of the continuance. Played to an extreme conclusion, this indiscriminate game of judicial musical chairs could collapse any semblance of sound administration, and work to the ultimate prejudice of many defendants awaiting trial in criminal courts.[6]

5. In determining that the refusal to grant the continuance was not a denial of due process, the Court cited the following circumstances as having a bearing on the issue: the five days' notice given to petitioner was not constitutionally inadequate time to hire counsel and prepare a defense to a case in which the evidence was fresh, the witnesses and any physical evidence was readily available, and the issues were clearcut and limited. The Court also noted that the motion for a continuance was not made until the day of the trial and that counsel was familiar with the Court's practice of not granting continuances.

6. For example, defendant A is listed in courtroom 1 for trial on day X. Defend-

This is not to say that there should be an arbitrary and inelastic calendaring of cases without due regard, for example, to the existence of conflicting demands for the service of a particular counsel by different courts or by the schedules within a multi-judge court. In judicial administration, too, there should be no absolutes. It is the trial judge who must balance the conflicting demands of court administration with the rights of the accused, conscious, however, that when he considers the rights of those accused of crime, he must consider not only those involved in the case immediately before him but also those of other defendants awaiting trial whose rights may be affected by the consequences of trial delay.

█ What is demanded here is the exercise of judicial discretion in the exquisite sense. The trial judge must avoid the Scylla and Charybdis of extremes. "[A] myopic insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defend with counsel an empty formality." But "it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." Unger v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849 (1963).

█ Due process demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his choice to prepare and conduct his defense.[7] The constitutional mandate is satisfied so long as the accused is afforded a fair or reasonable opportunity to obtain particular counsel, and so long as there is no arbitrary action prohibiting the effective use of such counsel. The conclusion becomes inescapable, therefore, that although the right to counsel is absolute, there is no absolute right to a particular counsel.

█ In the case at bar the defendant was afforded due process. Putting aside the two and a half month period from June 4, when he was represented by private counsel at the preliminary hearing, until August 28, when he was advised in open court that this lawyer was not representing him at the trial, the defendant was specifically informed that the court was affording him one additional month to obtain private counsel to prepare his defense and that his trial was postponed for one month to a day certain. One month is not a constitutionally inadequate time period in which to obtain counsel and prepare a defense, where, as here, the lines of communication were at all times open and defendant can show no good reason why he could not have contacted and retained an attorney within this time period.[8]

ant B is listed for trial in courtroom 1 for trial on day X + 7. A's successful application for postponement leaves courtroom 1 empty on day X. His trial is held instead on day X + 7, and B is denied a speedy trial. Multiply these factors by the number of postponements and it becomes obvious that an overzealous solicitation for defendant A could seriously impair the rights of defendant B.

7. Unger v. Sarafite, 376 U.S. 575, 84 S.Ct. 841 (1963) ; United States ex rel. O'Neill v. Rundle, 230 F.Supp. 323 (E.D.Pa. 1964), aff'd p. c. 341 F.2d 303 (3 Cir. 1965), cert. den. 381 U.S. 944, 85 S.Ct. 1783, 14 L.Ed.2d 707 (1965). See also United States v. Arlen, 252 F.2d 491 (2 Cir. 1958).

8. In Unger v. Sarafite, *supra*, the period of five days in which to obtain counsel and prepare a defense was held not to be constitutionally inadequate, in view of the facts of that case. The Supreme Court has stated that in deciding whether the refusal to grant a continuance is a denial of due process particular emphasis should be placed on the reasons presented to the trial judge at the time the request was denied. In the instant case, the ostensible reason for defendant's refusal to accept the services of the Voluntary Defender was that he had several cases pending against him and that he thought that he could be more effectively represented if one counsel handled his defense in all of these cases. On the morning of September 30, when for the third time the defendant moved for a continuance, no evidence was presented for the trial court to form a reasonable belief that the defendant would ever, at any time, be able to obtain private counsel. The statement of Mr. Leidner to the court on September 30 that he

To offset any further delay or complications, counsel was appointed for him in the person of the Voluntary Defender, who, in the intervening month, made several attempts to prepare his defense. The defendant steadfastly refused this assistance. When the appointed day came, he was still without private counsel. Nevertheless, a second continuance of two days was granted to enable counsel to gather certain specific information. On the Friday when the trial began, he was given the opportunity of counsel which he rejected, preferring to go to trial *in propria persona*. The court ordered appointed counsel to sit at his side and to be available for expert advice and counsel. It was only when the trial was already in progress that private counsel did in fact appear in the courtroom.[9]

When the trial judge expressed a willingness to adjourn the hearing and begin anew the following Monday, he was extending a courtesy not required, under these circumstances, by the constitutional demands of due process. On three different occasions, the case had been called for trial. On three different occasions the Commonwealth had assembled its witnesses and announced its readiness to proceed.

▮ In accommodating the conflicting considerations of either extending additional time for the defendant to obtain counsel of his choice or moving forward with the orderly process of judicial administration, the trial judge was called

upon to exercise his discretion.[10] We cannot say that the discretion he exercised impinged upon the constitutional rights of the defendant before him.

Accordingly, we will reverse the judgment of the district court.

was "not fully" retained may have indicated that he was willing to represent defendant in this case, but not in "all [his] cases" and that defendant wanted Mr. Leidner as his counsel only if he would act for him in all his cases.

Despite defendant's assertions that he intended to obtain private counsel to represent him on all of these charges, when he was tried on the remaining charges on April 3, 1967, he was represented by the Voluntary Defender.

9. Far from evincing the type of hostile attitude shown by the court in Chandler v. Fretag, *supra*, where defendant was given neither notice of the true nature of the charges against him nor any opportunity

to secure counsel, both the court and the prosecutor in the instant case zealously attempted to protect the rights of petitioner, even to the point of assigning a detective to assist the public defender in locating an alleged alibi witness.

10. See United States v. Restaino, 403 F. 2d 218 (3 . Cir. 1968) ; United States ex rel. Davis v. McMann, 386 F.2d 611 (2 Cir. 1967) ; United States v. Jones, 369 F.2d 217 (7 Cir. 1966) ; Releford v. United States, 288 F.2d 298 (9 Cir. 1961) ; Raullerson v. Patterson, 272 F. Supp. 495 (D.Colo.1967) ; United States ex rel. Puntari v. Maroney, 220 F.Supp. 801 (W.D.Pa.1963).