UNITED STATES of America

v.

Robert FLANAGAN, James Keweshan,
Sidney Landis, Thomas McNamee.

Crim. No. 81–270.

United States District Court,
E. D. Pennsylvania.

Dec. 2, 1981.

Luther E. Weaver, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Richard A. Sprague, Bruce L. Thall, Philadelphia, Pa., for defendants.

OPINION

LUONGO, District Judge.

Presently before me is the Government's motion to prohibit the law firm of Sprague and Rubenstone from representing all four defendants in this criminal case. The defendants, Robert Flanagan, James Keweshan, Sidney Landis and Thomas McNamee, all police officers employed by the Philadelphia Police Department, are each charged in a single indictment with conspiracy to violate the civil rights of citizens. 18 U.S.C. § 241. The indictment also charges substantive violations of citizens' civil rights, see 18 U.S.C. § 242, by Flanagan (Counts Two through Thirteen), McNamee (Counts Two through Thirteen), Landis (Counts Four through Thirteen), and Keweshan (Counts Two through Seven, and Eleven through Thirteen).

The defendants are members of a so-called "grandpop" squad, a decoy squad engaged in undercover operations to ferret out street crime. Typically, defendant Flanagan would pose as the decoy, with defendants Keweshan, Landis and McNamee as his backup. After being accosted and robbed by an assailant, Flanagan would signal the backup team by yelling: "Give me back my money." Keweshan, Landis and McNamee would then close in and make the arrest. The Government charges that over a period of about 17 months the defendants conspired to violate citizens' civil rights by arresting persons, under color of law, without probable cause, and that varying combinations of the defendants did in fact falsely arrest and/or physically abuse eight persons in violation of their civil rights.

Pursuant to the Government's request, and in accordance with Fed.R.Crim.P. 44(c),[1] a hearing was held on November 12,

1. Fed.R.Crim.P. 44(c), which became effective December 1, 1980, provides:

(c) *Joint Representation.* Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been

1981, to inquire whether defendants were aware of (1) the risk of joint representation, and (2) their right to separate representation. Each of the defendants was present at the hearing. Bruce Thall and James Leonard from the firm of Sprague and Rubenstone appeared on behalf of the defendants. At that time, Mr. Thall informed the court that, after extensive discussions with each defendant concerning the risks and pitfalls of joint representation, each still wished to be represented by the firm of Sprague and Rubenstone.

Among the areas which Mr. Thall stated had been discussed with each defendant were the following:

(1) Opening and closing statements—Unlike separate counsel, joint counsel would not be able to set one defendant apart from another.

(2) Sentencing—In the event that more than one defendant were convicted, joint counsel could not argue that one defendant was more or less culpable than another.

(3) Spillovers—Possibility that jury might infer from joint representation that if one defendant is found guilty, the others must be also.

(4) Possible grants of immunity—Each defendant was told that the Government could offer one of the defendants immunity on the condition that he testify against the others, thus interfering with a joint trial strategy.

(5) Nature of the evidence—It was explained to each defendant that the Government might introduce more evidence tending to implicate defendant Flanagan, and that as a result:

(a) the jury might infer that the others were also guilty because of joint representation,

(b) defense efforts might be more concentrated toward the defense of Flanagan.

(6) Right to testify—If one defendant exercised his right to testify on his own behalf and one or more of the others did not, the jury, from the fact of joint representation alone, might infer guilt on the part of those not testifying. Also, on cross-examination, the defendant who exercised his right to testify could be questioned as to his knowledge of activities involving the other defendants.

(7) Character and reputation testimony—Each was informed that if the defense offered character or reputation testimony on behalf of some but not all defendants, the jury might infer from the fact of joint representation that the character or reputation of the other defendants is undesirable.

(8) Right to separate counsel—Each defendant was apprised of his right to separate counsel, and that, if he could not afford counsel, the court would appoint counsel for him.

After Mr. Thall completed his outline of the areas discussed with the defendants, I questioned each defendant, individually and under oath, to ensure that each was aware of the potential conflicts that very likely could arise in this case. In addition to questioning the defendants on matters which had been explored by counsel, I also ascertained that each defendant understood that separate counsel could present a united defense strategy but, unlike joint counsel, could present alternative defenses as well. More importantly, I assured myself that financial considerations played no part in defendants' choice of joint counsel. Defendants advised me that their legal expenses were being paid by their union, the Fraternal Order of Police. Further, I advised each defendant that, if I ordered separate counsel and the union refused to defray the cost of such counsel, I would ap-

joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the

effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

point counsel for them. Finally, in the presence of the court and defense counsel only, each defendant was given the opportunity to explain in his own words why, in light of the several risks created by joint representation, he wished to be represented jointly with the other defendants.

At the conclusion of the hearing, I found that (1) a conflict of interest was very likely to arise in the course of the proceedings against defendants; (2) each defendant was fully and completely aware of the potential conflicts; and (3) each defendant, without financial pressure, had voluntarily and intelligently chosen to waive any claim of conflict of interest and elected to be represented by one counsel. Defense counsel and the Government were then instructed to brief the question of whether I must accept the defendants' waiver, notwithstanding the conflict of interest that I find is very likely to arise. In addition, I asked the parties to address the question of whether I must disqualify the firm of Sprague and Rubenstone from the case entirely, in the event that I order that each defendant be separately represented.

Both sides have now filed memoranda of law. Since defense counsel concedes [1(a)] that "logic mandates" that the firm of Sprague and Rubenstone must be disqualified should separate counsel be ordered, the sole question before me is whether I may, and should, reject the defendants' voluntary, knowing and intelligent waiver of their right to separate counsel, given the conflict which is very likely to arise.

To find that a conflict is likely to arise in this case, one need not look beyond the indictment and the numerous pretrial motions, together with supporting memoranda of law, filed by defense counsel. It is immediately apparent from reading the indictment that all four defendants are not charged in each count, reflecting the fact that each defendant's involvement may vary significantly from that of the others. Indeed, the basis of defendants' motion to dismiss Count One of the indictment focuses almost entirely on the differences in each defendant's role in the allegedly false arrests:

The indictment, then, charges that since arrests occurring on five days within the 17 month period (September 27, 1979; December 18, 1979; May 19, 1980; November 3, 1980; and January 6, 1981) were made without probable cause, therefore *each* of the movants necessarily conspired with each other to "arrest various citizens without probable cause" [Indictment, Count One, Paragraph 2] throughout the length and breadth of the 17 month period. In addition, only two movants, Flanagan and McNamee, participated in each of the five arrests. As is reflected in the "Indictment Breakdown", Landis was not involved in the arrest or other proceedings involving Walker and Howard, so that the indictment contains no hint that Landis could have been part of the conspiracy alleged, at least until the arrests of Woodrit and Young, on December 18, 1979.

Similarly, movant Keweshan is not alleged to have acted in any capacity, or even been present at, the arrests of Ford and Tooles on May 19, 1980. Indeed, the only arrests in which each movant is alleged to have participated, are those of Woodrit and Young, Adams, and Bibbs.

Defendants' Memorandum of Law in Support of Motion to Dismiss Count One of the Indictment (Document 12, at p. 3).

And again,

Indeed, the different identity of the alleged co-conspirators present during each "illegal" arrest, coupled with the disparate times within which the conspiracy is alleged to have existed, and the fact that, despite performing the same

---

**1(a).** I do not rely on defense counsel's apparent concession. Whether or not defendants concede it, based upon the presumption that privileged information has been acquired as a result of the attorney-client relationship, *see United States v. Provenzano*, 620 F.2d 985 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), logic does in fact mandate that, if separate counsel are ordered, Sprague and Rubenstone must be disqualified from representing even a single defendant.

activity throughout the totality of the period ostensibly covered by the conspiracy, on no other dates with no other arrests are such acts deemed to be "illegal", suggests not only that each "illegal arrest" was the product of a separate and distinct agreement, but also that each movant, on the other dates within the period while working as a police officer, necessarily "withdrew" from any agreement to violate any law.

*Id.* at 13. The likelihood that one or more defendants might, at some point, wish to distinguish his or their particular role from the others is hardly remote. Furthermore, defense counsel has observed correctly that this is a complex case which will most likely turn on circumstantial evidence which is "subject to various interpretations and fine distinctions." Defendants' Memorandum of Law in Support of Defendants' Motion for Discovery and Inspection (Document 10) at p. 3. Implicit within this complexity is the fact that essential to the Government's case is proof of each defendant's state of mind. The defendants expressly recognize that oral statements made by the defendants are essential to prove the requisite state of mind of each defendant. *Id.* at 3–4. The potential for conflict here is overwhelming since joint counsel's obligation to preserve the confidences of one defendant could severely hamper the cross-examination of any hearsay witness as to another defendant. Since a defendant's "guilt or innocence may turn on exactly what was said," *id.* at 4, I cannot lightly overlook this possibility of conflict.

The most glaring evidence of the potential for conflict which may arise if all defendants are represented jointly is found in defendants Keweshan, Landis and McNamee's motion for severance, and the accompanying memorandum of law (Document 13). Although paragraphs 2–5 of the motion are set forth in the footnote,[2] briefly stated, defense counsel contends in the motion for severance that defendants Keweshan, Landis and McNamee will be severely prejudiced if forced to stand trial with defendant Flanagan because it was Flanagan's information which provided the probable cause for each arrest. Specifically, counsel contends that prejudice will arise because the vast majority of the Government's evidence will be adduced against Flanagan. Hence, defense counsel argues in the memorandum of law in support of the motion for severance: "The circumstances underlying the present Indictment are such that Defendants Keweshan, Landis

**2.** In pertinent part, defendants Keweshan, Landis and McNamee's motion for severance states:

(2) Defendants Keweshan, Landis and McNamee, in the performance of this duty would remain hidden while co-Defendant Robert Flanagan, posing as an aged derelict, was confronted and robbed of his money by numerous individuals. Only after the criminals had taken his money and co-Defendant Robert Flanagan gave a standard alarm, "Give me back my money," did the backup officer come on the scene.

(3) Defendants Keweshan, Landis, and McNamee aver that the present Indictment, stripped to the core, discloses that all alleged violations of 18 U.S.C. §§ 241, 242 and 2 are by necessity based upon one of several arrests in which certain of them, in the performance of their duty, and only in response to their team leaders signal, acted to take a suspect into custody, reported their knowledge of this act to their superiors, and, in response to Subpoenas, gave testimony as to their participation in these arrests in various courts of law.

(4) Defendants Keweshan, Landis, and McNamee aver that (a) since their participation in each arrest underlying this Indictment was predicated on their receipt of a prearranged signal from co-Defendant Flanagan; (b) further, that from their places of hiding, they were not privileged to the details of what, in fact, occurred between co-Defendant Flanagan and the various persons who robbed him; and (c) each of the overt acts and acts included in substantive counts, related to certain of them in their individual capacity, is, standing alone, a legal act, and, in fact, was required either by circumstance or law.

(5) Defendants Keweshan, Landis and McNamee aver that in consideration of all the foregoing reasons, the Government's case, by necessity, will be dependent on facts and circumstances of which they have little or no knowledge, but, rather, the vast majority of the Government's evidence will be related to what transpired between co-Defendant Flanagan and the various individuals who robbed him.

and McNamee strongly urge upon this Court that 'the moment' when prejudice is likely to occur if they are forced to trial along with co-Defendant Flanagan is now." Defendants' Memorandum of Law in Support of Defendants' Keweshan, Landis and McNamee's Motion for Severance (Document 13) at p. 2. Because I too am gravely concerned by the prejudice which might redound to the other defendants by virtue of their association with Flanagan and, more particularly, by joint counsel's possible inability to distance Keweshan, Landis and McNamee from Flanagan, I must address the question of whether I may order separate counsel over defendants' voluntary, knowing and intelligent waiver of their right to separate counsel.

Fed.R.Crim.P. 44(c) provides that, "[u]nless it appears that there is good cause to believe no conflict is *likely to arise*, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." Fed.R.Crim.P. 44(c) (emphasis added). The phrase "such measures as may be appropriate to protect each defendant's right to counsel" is nowhere defined in the rule. Furthermore, since the rule did not become effective until December 1, 1980, there is no case law, as yet, interpreting the rule. Nevertheless, defendants argue that, based on pre-rule 44(c) precedents in this and other circuit courts of appeals, this court has no power to reject a criminal defendant's voluntary, knowing and intelligent waiver of separate counsel unless an *actual* conflict of interest is shown to exist. The Government argues to the contrary, contending that, pursuant to my obligation to supervise the conduct of members of the bar, I do have authority to reject the defendants' waiver and order that each be represented by separate counsel.

As with so many difficult legal questions, resolution of the issue before me requires a balancing of two substantial but competing interests. First, while it is often said that a criminal defendant does not have an absolute Sixth Amendment right to particular counsel, *United States ex rel. Carey v. Rundle*, 409 F.2d 1210 (3d Cir. 1969), *cert. de-*

*nied*, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970), that statement should not be construed to mean that a defendant has no constitutional right to counsel of his choice. The Third Circuit Court of Appeals has frequently stated that, within limits, a criminal defendant is entitled to be represented by particular counsel. *E.g., Davis v. Stamler*, 650 F.2d 477 (3d Cir. 1981); *United States v. Laura*, 607 F.2d 52 (3d Cir. 1979); *United States ex rel. Carey v. Rundle, supra.* However, against a defendant's Sixth Amendment right to counsel of his choice must be weighed this court's responsibility to supervise the professional conduct of attorneys practicing before it. *See, e.g., United States v. Miller*, 624 F.2d 1198 (3d Cir. 1980). In *Miller*, the district court disqualified the law firm representing Miller because a member of the law firm had been an assistant U. S. Attorney at the time the case against *Miller* was prepared. Even though the former government attorney had no direct involvement with the preparation of the case against Miller, the Court of Appeals upheld the district court's order disqualifying the attorney in order to avoid the appearance of impropriety which might result if former prosecutors were permitted to "assume private employment that appears to involve conflicts of interests." *Id.* at 1202–03. Similarly, in *United States v. Provenzano*, 620 F.2d 985 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), the district court disqualified a defendant's attorney because the attorney had previously represented the government's chief witness, Ralph Picardo, on a murder conviction. Although the defendant was willing to waive the conflict, the Court of Appeals upheld the district court's order because the attorney's duty to preserve the confidences of Picardo could interfere with the effectiveness of the attorney's cross-examination of Picardo on behalf of his client. Interestingly, the Court of Appeals accepted the district court's assumption (since no explicit findings were made) that the attorney possessed privileged information which involved him in a conflict. *See id.* at 1004–05.

Although the ethical considerations which justified disqualifying the criminal defendant's attorney in *Miller* and *Provenzano* did not stem from any multiple representation of defendants, the two decisions reflect clearly the Third Circuit Court of Appeals' heightened sensitivity toward ethical concerns and the district court's responsibility for enforcing the rules of ethics. This sensitivity is further reflected in *United States v. Quinones*, 613 F.2d 47 (3d Cir.), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 790 (1980), which, unlike *Miller* and *Provenzano*, did involve multiple representation of defendants. In *Quinones*, the district court found that a potential for conflict of interest existed and that the defendants had not made a knowing and intelligent waiver of their right to effective representation. The district court ruled, however, that the defendants could not be represented by the same counsel, and the Court of Appeals affirmed the ruling as not clearly erroneous. On only one occasion has the Court of Appeals for the Third Circuit reversed a district court for disqualifying counsel of a criminal defendant's choice, *see United States v. Laura, supra*, and then only because the district court failed to give any reasons on the record for so doing.

Defendants argue that *Miller, Provenzano* and *Quinones* are all inapposite to the issue presented by the Government's motion to prohibit multiple representation. Rather, defendants maintain that the Third Circuit Court of Appeals' decision in *United States v. Dolan*, 570 F.2d 1177 (3d Cir. 1978), is controlling. In *Dolan*, two defendants, Michael Garofolo and John Dolan, were represented jointly by Samuel DeLuca. The day before the trial was scheduled to begin, DeLuca, without Garofolo's knowledge, offered to have Garofolo plead guilty if the Government would agree to dismiss the charges against Dolan. Although the Government refused, Garofolo pled guilty on the date set for trial. After questioning Dolan and Garofolo about the dangers of multiple representation, the district court judge accepted Garofolo's guilty plea. With sentencing of Garofolo postponed, the trial against Dolan then went forward. Do-

lan took the stand in his defense and attempted to shift the guilt to Garofolo. Subsequently, the Government informed the court that Garofolo had been subpoenaed to testify as a rebuttal witness. At this juncture, the judge questioned DeLuca as to how he could represent Garofolo, who was awaiting sentencing, and effectively cross-examine Garofolo on behalf of Dolan. Although DeLuca stated that he perceived no conflict of interest, the district court ordered DeLuca to withdraw from representing either Garofolo or Dolan. On appeal, Dolan's attorney argued that Dolan had the right to waive his right to the effective assistance of counsel and to proceed with DeLuca as his attorney in spite of the conflict of interest. The Court of Appeals found that the district court had properly exercised its supervisory authority in disqualifying DeLuca and affirmed, stating:

Faced with an actual serious conflict of interest, rather than a mere possibility, in which it is obvious that Mr. DeLuca cannot "adequately represent the interest" of his client, Dolan, must the court accede to Dolan's waiver of conflict of interest? We think not. In the current effort to elevate the standards of the organized bar, the ABA Code of Professional Responsibility provides that "a lawyer may represent multiple clients [only] if it is obvious that he can adequately represent the interest of each . . . ." ABA Code of Professional Responsibility (1975) DR5–105(C). Accordingly, we hold that when a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems

implicating the defendant's comprehension of the waiver. Under such circumstances, the court can elect to exercise its supervisory authority over members of the bar to enforce the ethical standard requiring an attorney to decline multiple representation. See Note, *Conflict of Interests in Multiple Representation of Criminal Co-Defendants*, 68 Crim.L.&C. 226, 250 (1977).

570 F.2d at 1184 (notes omitted).

Defendants read *Dolan* as holding that only where an *actual* conflict of interest is found may a district court disregard a defendant's knowing and intelligent waiver of his right to effective representation. Thus, since no actual conflict of interest has been shown to exist in this case thus far, defendants contend that their Sixth Amendment right to counsel of their own choosing must be respected. Defendants' position appears to be in accord with decisions from the Second and Fifth Circuit Courts of Appeals which indicate that a criminal defendant may knowingly and intelligently waive his right to conflict-free representation, and that the district court's supervisory authority must give way to the defendant's Sixth Amendment right to particular counsel. *See United States v. Armedo-Sarmiento*, 524 F.2d 591 (2d Cir. 1975); *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

Unlike defendants, I do not read *Dolan* as holding that *potential* conflict is *never* sufficient to override a defendant's knowing and intelligent waiver of his right to effective representation. Indeed, that issue was not before the court. In *Dolan*, the conflict manifested itself *after* the trial had commenced. Here, I must determine whether a district court may take the initiative and exercise its discretion to avoid the serious potential for conflict before jeopardy attaches. Since I conclude that I may, and, more importantly, because of my grave concern that a conflict is very likely to arise in this case, I will grant the Government's motion and disqualify the firm of Sprague and Rubenstone from representing any of the defendants in this case.

In reaching my determination, I am influenced by several factors. First, Rule 44(c), which became effective more than two years after *Dolan* was decided, looks prospectively. Obviously, in advance of trial, the district court judge has very little opportunity to discern whether an actual conflict of interest exists as a result of multiple representation. To overcome this difficulty, some courts have resorted to what to me appears to be the fiction of finding that the attempted waiver is not knowingly and intelligently made. I simply refuse to adopt that approach where, after a thorough examination of defendants, four career police officers continue to desire to be represented by single counsel. Second, the concerns underlying the *Dolan* decision appear to be as pressing in this case. In *Dolan*, the Court of Appeals expressed concern not only over the breach of professional ethics arising from the joint representation, but also over the interest of the trial judge in being "free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court." 570 F.2d at 1184.

Although not easily applied, defense counsel's ethical responsibility to the defendants in this case is contained in *ABA Standards Relating to the Defense Function* § 3.5 (Approved Draft 1971) which, in relevant part, provides:

> The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is *clear that no conflict is likely to develop* and when the several defendants give an informed consent to such multiple representation.
>
> (Emphasis supplied)

*See also ABA Code of Professional Responsibility* DR5–105. Based upon defense counsel's submissions to the court, I have no doubt that this is not a case where "no conflict is likely to develop." Indeed, I am not sure whether defense counsel is even in a position to discuss the possibilities of conflict with the defendants:

A summary reading of the Indictment will convince the Court that not only are the Defendants unable to determine what particulars the Government intends to prove against them as a group, but perhaps more importantly, the Defendants as individuals are unable to make a reasoned determination whether there is a defense available to one individual which might prove adverse to the others. Absent the ability to make such a determination, the Defendants, if forced to trial absent a Bill of Particulars, will be denied their right to a fair trial guaranteed by the Sixth Amendment of the United States Constitution, and the effective assistance of council (*sic*) guaranteed by the Fifth Amendment of the United States Constitution.

Defendants' Memorandum of Law in Support of Motion for Bill of Particulars (Document No. 7) at p. 4.

Finally, merely because I find the defendants' waiver of their right to effective representation to be knowing and intelligent today in no way guarantees the continuing validity of that waiver throughout the remainder of the proceedings against them. Under such circumstances, must I sit back and wait for a potential conflict to become an actuality? If my finding that there is a potential for conflict were based upon mere speculation, I too would agree that the court should not interfere with a defendant's choice of counsel. But, where the likelihood is great that a potential conflict may escalate into an actual conflict, and thus threaten to render the entire trial process null and void, I believe it is well within a court's discretion to anticipate the conflict and disqualify defense counsel.

In support of their argument that an actual conflict of interest is necessary before a valid waiver can be rejected, defendants cite the Supreme Court's recent decision in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), which held that to establish a violation of his Sixth Amendment right to the effective assistance of counsel, a criminal defendant must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. *Cuyler* dealt with issues substantially different from those presented in this case. *Cuyler* went to the Supreme Court on *certiorari* from a ruling of the Court of Appeals for the Third Circuit directing the district court to grant a state prisoner's petition for a writ of habeas corpus. Applying the standard enunciated in *United States ex rel. Hart v. Davenport*, 478 F.2d 203, 210 (3d Cir. 1973), the Court of Appeals had held that Sullivan had been deprived of his Sixth Amendment right to the effective assistance of counsel because a possible conflict resulted from the joint representation of Sullivan and a co-defendant during their separate trials in state court. The Supreme Court reversed, holding that possible conflict was insufficient to constitute a violation of Sullivan's constitutional rights.

I am not persuaded that *Cuyler* requires a showing of an actual conflict of interest before defense counsel may be disqualified over defendants' knowing and intelligent waiver. In *Cuyler*, the trial (in the state court) had taken place. It was an accomplished fact. What happened at the trial with joint counsel was history. To require a showing of actual conflict of interest to establish a violation of a defendant's constitutional rights in a completed trial provides no authority compelling a court to wait until an actual conflict arises before it may act to forestall a violation of those same rights. *Cuyler* did not involve disqualification of counsel on ethical grounds. *Cuyler* did not involve application of F.R.Crim.P. 44(c). As noted earlier in this opinion, Rule 44(c) is prospective in its thrust. Clearly the intent of the rule would be frustrated if a court were forced to await a constitutional violation before it could act to prevent it. Thus, while I recognize that the defendants have a right to counsel of their choice, that right is not unlimited and must yield to the court's overriding interest in protecting their rights to adequate representation and fair trial, and in preserving the integrity of its procedures.

Accordingly, for the reasons expressed in this opinion, I will grant the Government's motion to prohibit multiple representation and disqualify the firm of Sprague and Rubenstone from representing any of the four defendants.[3]

**3.** My decision to disqualify defense counsel is based upon the conflict of interest which I find is likely to result from the multiple representation of the four defendants. The Government, in its Supplemental Memorandum in Support of Its Motion for Disqualification, has attempted to interject a new conflict. Specifically, the Government states that Sprague and Rubenstone also represented Officer James Kennedy during the grand jury investigation of the defendants and that Kennedy is a possible government or defense witness in the pending case. If this were the only ground for disqualification I would not be inclined to give it much weight, for to do so would permit the Government to create a potential conflict where none might otherwise have been likely to arise. Under the circumstances, however, where I have been persuaded that other grounds for disqualification are sufficient this added fact demonstrates the danger inherent in an attorney's attempt to represent multiple persons charged with unlawful activity.