454 A.2d 1111

**COMMONWEALTH of Pennsylvania**

v.

**Shirll JOHNSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 29, 1982.

Filed Jan. 7, 1983.

Charles A. Fitzpatrick, III, Philadelphia, for appellant.

Gaele M. Barthold, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, WICKERSHAM and CIRILLO, JJ.

WICKERSHAM, Judge:

On August 15, 1980, Shirll Johnson went to trial before the Honorable Kendall H. Shoyer and a jury on charges of theft and robbery, Nos. 1903 and 1904 May Term 1980.

In his opinion filed April 14, 1981, pursuant to Pa.R.A.P. 1925(a), Judge Shoyer summarizes the facts accurately as follows:

> This is a 'granny squad' case. On April 25, 1980 at around 11:30 p.m. thirty-seven year old Shirll Johnson asked Grandpop Squad decoy Andrew Kalmar, No. 4487, sitting on a milk crate in the 1200 block of Cuthbert Street, Philadelphia, for some money. Cuthbert is a narrow street running parallel to and just south of Arch Street. Kalmer refused, but agreed to give defendant a cigarette. Johnson tried to grab from Kalmar the bundle of decoy play money, wrapped in currency which he saw attached to Kalmar's cigarettes with a rubber band. The

two men wrestled. Johnson said: 'Give it up' as he grabbed the money, swung at Kalmar with his fist, missed and ran. Two back up policemen apprehended the defendant a few seconds later. After a trial before the undersigned and a jury the verdict was guilty of robbery.

Defendant filed two assignments of error in his post verdict motions which, after argument, were dismissed by the Court. This was defendant's sixth felony conviction and he was sentenced to a term of five to twelve years in prison. From the sentence the instant appeal has been taken.

Lower ct. op. at 1–2.[1]

Appellant argues in his brief that trial counsel was ineffective for failing to raise the issue of entrapment, "the only reasonable and credible defense available to appellant." Brief for Appellant at 7.[2]

Entrapment is defined as follows:

### 313. Entrapment

(a) **General rule.**—A public law enforcement official or a person acting in cooperation with such an official perpe-

---

1. Appellant sets forth the statement of questions involved as follows:
   I.  Did defense counsel's failure to raise the defense of entrapment constitute ineffective assistance of counsel in violation of appellant's constitutional rights?
   II. Did the trial court's denial of appellant's motion for change of attorney, deprive appellant of his constitutional right to effective assistance of counsel?
   Brief for Appellant at iii.

2. Though not raised previously, this issue has not been waived. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).
   We have recently held that newly appointed or retained counsel must raise on appeal the ineffectiveness of his predecessor trial counsel or that claim will be deemed waived. *Commonwealth v. Smallwood*, 465 Pa. 392, 350 A.2d 822 (1976); *Commonwealth v. Carter*, 463 Pa. 310, 344 A.2d 846 (1975); *Commonwealth v. Strachan*, 460 Pa. 407, 333 A.2d 790 (1975); *Commonwealth v. Twiggs*, 460 Pa. 105, 331 A.2d 440 (1975); *Commonwealth v. Dancer*, 460 Pa. 95, 331 A.2d 435 (1975). The rule that emerges from these cases is that ineffectiveness of prior counsel must be raised as an issue at the earliest stage in the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant. *Id.*, 472 Pa. at 276–77 n. 6, 372 A.2d at 695 n. 6.

trates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(1) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

**(b) Burden of proof.**—Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment.

**(c) Exception.**—The defense afforded by this section is unavailable when causing or threatening bodily injury is an element of the offense charged and the prosecution is based on conduct causing or threatening such injury to a person other than the person perpetrating the entrapment.

18 Pa.C.S. § 313.

In *Commonwealth v. Lee,* 262 Pa.Super. 218, 396 A.2d 724 (1978), appellant was convicted of promoting prostitution, and contended that a new trial was necessitated by the failure of the court below to charge the jury on entrapment:

The pertinent facts are simple. The Reading Police Vice Squad secured the assistance of an auxiliary policewoman, Ms. Donna Bendel, to act as a decoy in their investigations. She was instructed to stand in the area of Seventh and Chestnut Streets in the City of Reading, a section known to have a high incidence of crime. Both parties agree that she is an attractive woman, and her attire on the day in question included a pair of long pants, a white turtleneck sweater and a green T-shirt. Ms.

Bendel's orders were to say nothing until approached, and then merely to reply, 'What do you mean' if propositioned.

On March 26, 1976, appellant drove by the decoy, parked his car, and walked back to where she was standing. He then stated that she could earn more money by not walking the streets. She replied, 'What do you mean,' and he retorted that she would make more by turning tricks at the Mushroom Plant. She again responded, 'What do you mean,' and appellant argued that the career he proposed would be better than standing on a corner. Ms. Bendel then gave a signal to the police officers observing the scene, who apprehended appellant after a brief chase and arrested him.

. . . .

The defense is available, however, and a jury charge is necessary, only if there is evidence that the defendant was not disposed to commit the crime and that the police conduct was likely to entrap the innocently disposed defendant. . . . Thus, artifice and strategem are legitimate tactics that may be employed by law enforcement officials to detect and combat crime. Merely affording opportunities or facilities for the commission of a crime by one who already had the criminal intent to engage in such a crime does not defeat the prosecution. . . .

In the instant case, there is no evidence that the police action constituted a method of persuasion that created a substantial risk that persons not otherwise ready to commit the crime would do so. This is not a situation as was presented in *Commonwealth v. Clawson*, [250 Pa.Super. 422, 378 A.2d 1008], *supra*. In *Clawson*, a police informant asked the defendant if he could get a pound of marijuana for an acquaintance. The informant was a friend of the defendant and the latter said he would check on the availability of the drug. Subsequently, the defendant received $170 from the informant, procured the marijuana, and turned it over to the informant. The defendant had never been a drug dealer, did not make a profit

on the deal, and testified that he delivered the marijuana only because the informant was a friend. The defendant was convicted of delivery of marijuana, but this court subsequently reversed the judgment of sentence and remanded for a new trial as a result of the failure to give instructions on entrapment.

Unlike *Clawson,* however, the decoy was here instructed not to initiate conversation with any potential customer, nor to speak at all, save for the non-committal 'What do you mean.' She did not quote prices or suggest locations for the proposed work; actions which might conceivably be construed as inducing the crime. Rather, she merely stood silently and allowed appellant to approach her.

There is nothing reprehensible about this procedure, and its use has been sanctioned in other jurisdictions. *See, e.g., Williams v. United States,* 342 A.2d 367 (D.C. 1975) (no entrapment found in a conviction for solicitation of prostitution when female police decoy said nothing and defendant broached terms for the 'trick'); *State v. Wilson,* 41 Wis.2d 29, 162 N.W.2d 605 (1968) (no entrapment when non-uniformed male officer sat in car and was approached by a female who asked him if he wanted a girl and quoted terms for her work). If, as appellant contends, the ploy was infirm because of the decoy's positioning in a high crime area, the police would be restricted from using efficacious methods of detection precisely in those areas in which crime control is most imperative. To adopt appellant's argument would lead to just such an absurd result.

The judgment of sentence is therefore affirmed.

*Id.,* 262 Pa.Superior Ct. at 220–223, 396 A.2d at 724–26.

■ Instantly we have a clear factual situation whereby the police properly used artifice and strategem to detect and combat crime. Officer Kalmar merely afforded opportunities for the commission of a crime by the appellant who clearly already had the criminal intent to engage in such a crime. Under the circumstances here present, entrapment

was not an available defense and a jury charge on the same was not necessary or appropriate.

At trial Officer Andrew Kalmar had testified:

Q. Officer, would you describe briefly the function of the Grandpop Squad?

A. Yes. It is a detail composed of four men. We go into high crime areas where street robberies are committed dressed as insurance men, elderly people, whatever the type of crime might be. We go into these areas hoping if there is going to be a robbery that it will be committed on us rather than a citizen.

Q. Now, Officer, on April 25th of 1980 were you working as a police officer that date?

A. Yes.

. . . .

A. On that day I was dressed as an elderly person. I had on an older suit, a boot on one foot and a hospital shoe on my other foot, a sport coat, a shirt with a sweater over it, and a long three-quarter length black overcoat. I had a hat and my beard was much longer then than it is now.

. . . .

Q. Now, Officer, after those two men left what, if anything, did the defendant do or say?

A. He then came over to me and he asked me for some money. I told him that I only had enough for bus fare. And then he said, well, give me a cigarette, and I did. I gave him a cigarette.

Q. From where did you produce the cigarette, Officer.

A. The cigarette was in my left front coat pocket.

Q. Did you take out a pack?

A. Yes.

Q. After you gave the defendant this cigarette what, if anything, happened?

A. He stood in front of me and he had his own matches. He lit the cigarette up and he looked around. He looked up and down the street back and forth a few times.

Q. At that point did you see any other persons on the 1200 block of Cuthbert Street?

A. No.

Q. Then what happened?

A. Like I said, he looked around left, right a few times and then I was pushed back, suddenly pushed back against the wall.

Q. By whom were you pushed?

A. By the defendant here.

Q. Which hand did he use to push you?

A. He used his left hand. And at the same time as he pushed me back against the wall, straightening me up he went into my left front coat pocket with his right hand and he took out twelve one-dollar bills.

Q. Did you have those bills loose or how were they in your pocket?

A. The bills were attached with a rubber band which also had some theatrical money inside the bills and they were attached to my cigarettes by a rubber band.

Q. Now, Officer, while we are talking about these bills, was there anything unusual about the dollar bills?

A. The dollar bills were marked with my badge number on them, 4487.

. . . .

Q. Now, after the defendant went in your pocket—with which hand?

A. His right hand.

Q. —what happened?

A. As he went in and he took the money out of my pocket, I grabbed his hand and he said, 'Give me a dollar, pop.'

I said, 'No.'

And then he—I continued holding his hand and he told me, 'Give it up.' That was his words, 'Give it up.'

And at that point with his left hand he swung at my head, which I ducked, and then he pulled away from me and he partially pulled me up off the street and he started to run east on Cuthbert Street.

Q. At that point did the defendant say anything else?

A. No.

Q. He began to run in which direction?

A. I'm sorry. There was—if I might go back a second. There was one other thing that he said. I told him, I said, 'Please, it's all the money—'. When I was holding onto his hand, I said, 'Please, that's all the money I have.'

And he said, "I don't give a fuck.' And that's when he swung at my head.

Q. As he ran off, which direction did he go?

A. He ran east on Cuthbert Street.

Record at 21–22, 29–32.

In *Commonwealth v. Danko,* 281 Pa.Super. 97, 421 A.2d 1165 (1980), we said:

"This rule calls for an objective evaluation of police conduct to determine whether there is a substantial risk that the offense will be committed by persons innocently disposed. Thus ... it must be shown that the police conduct would have induced an innocent person to commit the crime." *Commonwealth v. Stokes,* 264 Pa.Super. 515, 518, 400 A.2d 204, 206 (1979). *See Commonwealth v. Jones,* 242 Pa.Super. 303, 363 A.2d 1281 (1976); Toll, Pennsylvania Crimes Code Annotated, p. 146 (1974) (Reporter's Comment: "This section overrules the predisposition test").

*Id.,* 281 Pa.Superior Ct. at 109, 421 A.2d at 1171.

■ Moreover, trial counsel's decision to present a particular defense is a tactical one and counsel is not ineffective so long as his chosen course of action has some reasonable basis designed to effectuate his client's interest. *Commonwealth v. Faison,* 437 Pa. 432, 264 A.2d 394 (1970). *See also Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967) (where it was stated that a reviewing court should not view in hindsight whether one course of action was more reasonable than another). Since proffering an entrapment defense necessarily requires a defendant to admit the crime, counsel could have deemed it

more reasonable under the facts here to simply challenge the sufficiency of the evidence. An entrapment defense, in addition to its futility, would have removed this option. Viewing the record, it is clear that trial counsel afforded defendant a reasonable defense effectuating defendant's best interest.

■ The final issue raised by appellant is utterly devoid of merit. Appellant suggests that he was compelled by the trial court to be represented by an attorney in whom he had a lack of confidence. The record belies this allegation. Appellant concedes in his brief that "appointed counsel was an experienced and skilled attorney." Brief for Appellant at 12. At a hearing held August 15, 1980 before Judge Shoyer, the following colloquy took place:

BY THE COURT:

Q. Mr. Johnson, you are represented by the Public Defender's Office, by Mr. Martin Stanshine, who I know to be competent counsel.

What's your problem?

A. He told me that this case is real serious and I don't like the way he was talking. I would like to get a court-appointed lawyer.

Q. Do you have funds to retain your own lawyer?

A. No, I don't.

Q. Well, we don't appoint private counsel when we have the Public Defender who is thoroughly experienced and ready to proceed.

A. Well, I don't like the way he talked to me upstairs. Couldn't I get another lawyer?

Q. What didn't you like about the way he talked to you?

A. The attitude he took.

Q. What do you mean by the attitude?

A. You can tell if somebody talks to you real nasty.

Q. Just what did he say?

A. I don't pay that much attention, but the attitude he took. You know, when somebody takes an attitude.

Q. You will have to be explicit and explain what you mean.

A. Well, I prefer not to have him.

Q. Well, that's no reason for me to remove him. I know he is competent.

A. I'm not a lawyer. I can't go into the words.

Q. I know he is competent.

A. Well, that's you. I don't want him.

Q. Well, you can get somebody you want that you can pay for.

A. Well, if I have to have him—you say I have to, I have to.

Q. You have to what, Mr. Johnson? I assume you are not a lawyer. Under the law you are entitled to competent counsel. Now, just because you don't like the counsel or the way he talks to you, approaches you, is not sufficient.

THE DEFENDANT: Will you explain to him upstairs because he might not believe me.

MR. STANSHINE: Explain what I said upstairs? What part?

THE DEFENDANT: The curse words you used.

MR. STANSHINE: Would Your Honor like to hear the curse word I used?

THE COURT: Yes.

MR. STANSHINE: I told him, 'I don't want anymore of this bull shit.'

THE DEFENDANT: What do you mean by bullshit?

MR. STANSHINE: When you say 'Let's give up, I'm going to be convicted.' That.

THE DEFENDANT: I didn't tell you that. I said I've been through this before. You don't consider that coming to me the wrong way?

THE COURT: No, not the way he explained it to me.

THE DEFENDANT: It's out of my hands. I just said I didn't want him.

THE COURT: He's experienced and he has been trying cases for eleven years.

THE DEFENDANT: The way he said it. When people say things the expression on their faces looking directly

at him, he didn't have the expression that he had on his face when he talked to you that he had when he was talking to me.

THE COURT: That's not sufficient. I'm sorry.

THE DEFENDANT: Okay. If you say so.

THE COURT: You will have an opportunity to participate in the selection of the jury, twelve citizens and two alternates from the City of Philadelphia.

The motion for change of counsel is denied.

Record at 3–6.

Pa.R.C.P. 316 provides:

**Rule 316. Assignment of Counsel**

**(a) In Summary Cases**

Counsel shall be assigned in all summary cases to all defendants who are without financial resources or who are otherwise unable to employ counsel when there is a likelihood that imprisonment will be imposed.

**(b) In Court Cases**

In all court cases counsel shall be assigned prior to the preliminary hearing to all defendants who are without financial resources or who are otherwise unable to employ counsel.

**(c) In all Cases**

(i) The court, of its own motion, shall assign counsel to represent a defendant whenever the interests of justice require it.

(ii) A motion for change of counsel by a defendant to whom counsel has been assigned, *shall not be granted except for substantial reasons.*

(iii) Where counsel has been assigned, such assignment shall be effective until final judgment, including any proceedings upon direct appeal.

(Emphasis added.)

In *Commonwealth v. Olivencia*, 265 Pa.Super. 439, 402 A.2d 519 (1979), we said:

Appellant also contends that he was deprived of his right to counsel when the court refused to replace trial

counsel as requested by appellant. Appellant claims such a replacement should have been made because the attorney-client relationship deteriorated due to counsel's advising appellant to plead guilty, and because both appellant and counsel joined in the motion for replacement. It is well established that an indigent is entitled to free counsel, but not entitled to free counsel of his choice, *see Commonwealth v. Johnson,* 428 Pa. 210, 236 A.2d 805 (1968), and although the right to counsel is absolute, there is no absolute right to a particular counsel. *See United States ex rel. Carey v. Rundle,* 409 F.2d 1210 (3d Cir.1969), *cert. denied* 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970). Upon appellate review, we are mindful that the decision whether a petition for change of court-appointed counsel should be granted is within the sound discretion of the trial court, *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462 (1975), and as such, should not be overturned unless we find an abuse of that discretion.

*Id.,* 265 Pa.Superior Ct. at 447, 402 A.2d at 522–23.

Instantly, we find no abuse of discretion.

Judgment of sentence affirmed.