198 N.J. Super. 53 (1984)
486 A.2d 846
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES BURNETT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 10, 1984.
Decided October 24, 1984.
*55 Before Judges MICHELS, PETRELLA and BAIME.
Joseph H. Rodriguez, Public Defender of New Jersey, for appellant (Robert S. Persky, designated counsel).
Irwin I. Kimmelman, Attorney General of New Jersey, for respondent (Brian Granstrand, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by, BAIME, J.A.D.
Following a jury trial, defendant was convicted of sexual assault (N.J.S.A. 2C:14-2c(1)), simple assault (N.J.S.A. 2C:12-1a(1)) and aggravated sexual assault (N.J.S.A. 2C:14-2a(2)(a)). Defendant was sentenced to an aggregate custodial term of 15 years and ordered to pay $550 to the Violent Crimes Compensation Board. On appeal, defendant attacks the constitutionality of R. 3:12 which requires an accused to serve notice of his intention to claim insanity on the prosecuting attorney within 30 days of the date of his original plea. In a related argument, defendant contends that the trial judge abused his discretion when he precluded him from raising the insanity defense by virtue of his failure to comply with the rule's prescription. Defendant further contends that his confession constituted the fruit of an unlawful arrest and should have been suppressed. Since no objection was interposed in that regard, the latter point is advanced as plain error. Finally, it is argued that the trial judge committed reversible error with regard to certain of his evidentiary decisions. We are convinced that none of these contentions has merit. We thus affirm the judgments of conviction.
The record discloses the following facts. At the time of the offenses, defendant and his daughter, Lenette Spruill, resided at his mother's house. Lenette, who was then 13 years of age, had her own bedroom. Also residing in a separate room at the same house were defendant's girlfriend, Brenda DuBois, and *56 her son. On Friday, August 7, 1981, defendant went to his place of employment at approximately 7:00 a.m. and remained at work until 5:30 p.m. the next day. During that period of time and on the trip home, defendant consumed a "combination of whiskey and gin." It would also appear that defendant smoked marijuana and later ingested several pills "to keep awake." In any event, defendant arrived home at approximately midnight and immediately engaged Brenda in an argument pertaining to her alleged infidelity. Defendant ordered her to leave the house. Once outside, defendant physically attacked Brenda, ultimately rendering her unconscious. Lenette unsuccessfully attempted to awaken defendant's mother and subsequently sought to intercede in the fracas. When Brenda regained consciousness, defendant directed both her and his daughter to enter his van which was parked in the driveway. Defendant then proceeded to have sexual intercourse with Lenette and Brenda. After the attack, defendant apparently fell asleep. Lenette subsequently fled to the home of her maternal grandmother. On the following morning, she apprised her great uncle of what had occurred. After leaving the van, Brenda awakened defendant's mother and told her that she had been "beaten" and "raped." They then proceeded to the police station.
While Brenda was being taken to the hospital, defendant's mother, accompanied by several officers, returned to her house. When they arrived, the officers were given the key to the front door and were granted permission to enter. Defendant initially appeared at the back door, but subsequently locked it when the officers identified themselves. One of the officers opened the front door with the key and walked toward the rear of the house where he was able to observe defendant being searched by another policeman in the rear yard. Defendant was handcuffed, advised of his constitutional rights which he said he understood, and transported to police headquarters. At approximately 7:30 a.m., defendant was again advised of his rights and was interviewed in the detective bureau. In a *57 written statement, defendant admitted having intercourse with Brenda, but could not recall whether he had penetrated his daughter.
Defendant initially argues that R. 3:12 is unconstitutional because it imposes an unnecessary burden on the right of an accused to contest his sanity. We are entirely satisfied that the rule's prescription fully comports with well recognized principles of due process. The genesis of R. 3:12 can be found in our Supreme Court's decision in State v. Whitlow, 45 N.J. 3, 25 (1965). There, the Court established various ground rules with regard to the reciprocal right to have a defendant submit to a psychiatric examination when he pleads mental incapacity to stand trial or the defense of insanity. Addressing questions pertaining to notice, the Court "perceive[d] the difficulties attending the State's effort to meet a claim of insanity, particularly at the time of trial when the allegation is offered to show the lack of criminal responsibility for the offense." Ibid. Noting that the State should not be left helpless to meet the defense, the Court suggested adoption of a rule requiring pretrial disclosure of the accused's intent to advance the insanity claim. Ibid. Significantly, the Court analogized the proposed requirement with the alibi rule and observed that "[p]rocedural requirements for notice of the defense have [generally] been sustained." Id., 45 N.J. at 22, n. 3. Several years later, the precursor to R. 3:12 was promulgated requiring notice of the defense of insanity at the time of the original plea or within 30 days. See R.R. 3:5-9A. Our present rule is essentially the same except that it additionally mandates notice of the defense of diminished capacity. Further, the rule requires that the notice be in writing. The notice requirement has also been codified by our Legislature in N.J.S.A. 2C:4-3.
Contrary to defendant's argument, we do not perceive that the rule places an improper burden upon an accused who wishes to claim insanity. The salutary purpose of the rule is to avoid surprise at trial by the sudden introduction of a factual *58 claim which cannot be investigated without requiring a substantial continuance. Our Constitution "does not protect a defendant from the consequences of the defense he makes, nor assure him a right so to defend as to deny the State a chance to check the truth of his position." State v. Angeleri, 51 N.J. 382, 385 (1968), cert. den. 393 U.S. 951, 89 S.Ct. 372, 21 L.Ed.2d 362 (1968). Cf. State v. Baldwin, 47 N.J. 379, 388 (1966), cert. den. 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966); State v. Harris, 117 N.J. Super. 83, 91 (App.Div. 1971), certif. den. 63 N.J. 557 (1973). Given the ease with which the defenses of insanity and diminished capacity can be fabricated, the State's interest in protecting itself against "an eleventh-hour" claim is both obvious and legitimate. See Williams v. Florida, 399 U.S. 78, 81, 90 S.Ct. 1893, 1899, 26 L.Ed.2d 446, 450 (1970). "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." 399 U.S. at 82, 90 S.Ct. at 1899, 26 L.Ed.2d at 450. The principal purpose of our discovery rules is to assure the parties every legitimate avenue of inquiry prior to trial to enhance the search for the truth. As long as such rules are hedged by reciprocal duties requiring state disclosure, we discern nothing which offends common notions of fundamental fairness or recognized principles of due process. Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). See also State v. Smith, 185 Conn. 63, 441 A.2d 84, 95 (1981).
Equally unavailing is defendant's claim that the rule effectively deprived him of the right to present a viable defense. To be sure, the United States Supreme Court, while upholding the constitutionality of reciprocal discovery rules, has expressly refused to address the question of the validity of the threatened sanction for non-compliance. In Williams v. Florida, supra, 399 U.S. at 83, n. 14, 90 S.Ct. 1899, n. 14, 26 L.Ed.2d at 451, n. 14, the Court sustained the validity of mandated pretrial disclosure of the alibi defense, but observed "[w]hether and to what extent a State can enforce discovery rules against *59 a defendant who fails to comply, by excluding relevant, probative evidence is a question raising Sixth Amendment issues which we have no occasion to explore." In a somewhat related context, however, the Court subsequently upheld the constitutionality of Fed.R.Crim.P. 12(b)(2) which precludes presentation of defenses pertaining to defects in the indictment unless made prior to trial. See Davis v. United States, 411 U.S. 233, 236-237, 93 S.Ct. 1577, 1581, 36 L.Ed.2d 216, 221-222 (1973). The Court noted that "[i]f defendants were allowed to flout [the rule's] time limitations ... there would be little incentive to comply with its terms." 411 U.S. at 241, 93 S.Ct. at 1593, 36 L.Ed.2d at 224. We further observe that federal practice currently requires pretrial disclosure of the intention to raise the insanity defense and precludes its presentation for noncompliance. See Fed.R.Crim.P. 12.2(a). The sanction of preclusion has been strictly applied by the federal courts in a variety of factual settings. See United States v. Goguen, 723 F.2d 1012, 1022 (1st Cir.1984); United States v. Veatch, 674 F.2d 1217, 1224-1225 (9th Cir.1981) cert. den. 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); United States v. Caplan, 633 F.2d 534, 539 (9th Cir.1980); United States v. Winn, 577 F.2d 86, 89 (9th Cir.1978).
We discern compelling state interests which strongly militate in favor of the sanction of preclusion where the rule has been repeatedly and flagrantly violated.[1] We have already alluded to important public policy concerns which compel broad pretrial discovery. Perhaps it bears repeating that the stakes in a criminal trial are enormously high. The liberty interests of the *60 accused are pitted against society's right to be protected. Within that context, it is particularly appropriate that gamesmanship should be discouraged. R. 3:12 advances that essential public purpose. Further, we would be myopic were we not to note the overcrowded dockets and serious delays which often plague our court system. It has been noted that calendar control, especially in metropolitan communities, "is a sophisticated operation constantly buffeted by conflicting forces." United States ex rel. Carey v. Rundle, 409 F.2d 1210, 1213 (3rd Cir.1969). The prosecution's "legitimate demands for some stability in the scheduling of cases" and the full panoply of rights afforded an accused under our Constitution are constantly in potential or real conflict. Ibid. A criminal calendar is critically dependent upon the predictability of the appearance of prosecution and defense witnesses. "Delays and postponements only increase the reluctance of witnesses to appear in court," especially in criminal cases where there is no pecuniary motivation. Ibid. Moreover, to accommodate one defendant may in itself prejudice the rights of others whose trials are thereby delayed. The staggering statistics presently confronting our court system speak for themselves. Under such circumstances, the adage "justice delayed is justice denied" becomes something more than a mere aphorism.
Consideration of these competing values leads to the conclusion that substantial discretion should be conferred upon the trial judge to determine the appropriate sanction and remedy when our discovery rules have been violated. The trial court must afford both the State and the defense a fair opportunity to prepare for trial. However, under no circumstances may the parties play a game of "cat and mouse" or seek to have the trial judge placed in a position where, in moving along the business of the court, he appears to be arbitrarily depriving the parties of important rights. United States ex rel Davis v. McMann, 386 F.2d 611, 618-619 (2nd Cir.1967), cert. den. 390 U.S. 958, 88 S.Ct. 1049, 19 L.Ed.2d 1153 (1968). We do not suggest that otherwise viable defenses should be suppressed *61 whenever the defense fails to comply with our discovery rules. In that regard, we note that the sanction of preclusion is a drastic remedy and should be applied only after other alternatives are fully explored. Note, "The Preclusion Sanction: A Violation of the Constitutional Right to Defend," 81 Yale L.J. 1342, 1356-1359 (1972). Cf. State v. Utsch, 184 N.J. Super. 575, 580 (App.Div. 1982); State v. Volpone, 150 N.J. Super. 524, 529 (App.Div. 1970); State v. Moore, 147 N.J. Super. 47, 51 (App.Div. 1977); State v. Nunn, 113 N.J. Super. 161, 168-169 (App.Div. 1971); State v. Woodard, 102 N.J. Super. 419, 426-427 (App.Div. 1968), certif. den. 53 N.J. 64 (1968), cert. den. 395 U.S. 938, 89 S.Ct. 2004, 23 L.Ed.2d 453 (1969). Nevertheless, repeated and flagrant derelictions may require application of the sanction of preclusion. This is not to say that the rights of the accused are to be sacrificed in the guise of calendar control. It is merely to recognize that adherence to our court rules constitutes an essential ingredient of fairness and justice.
Our review of the record convinces us that the trial judge did not mistakenly exercise his discretion in this case. In point of fact, the desultory pace of the defense's efforts with respect to pretrial discovery is illustrative of the problems that we have mentioned. Between September 3, 1981, when defendant entered his original plea, and January 14, 1982, pretrial conferences were scheduled by the trial judge and adjourned at defendant's request no less than seven times. On January 14, 1982, the pretrial conference was finally conducted. Plea negotiations were unfruitful and the case was scheduled for trial. When the matter was first set for trial, defense counsel marked the case "ready" without alluding to the possibility that insanity would be claimed. By a letter dated April 16, 1982, defense counsel advised the prosecutor that insanity would be a "possible defense" at trial. Even defense counsel's belated "notice of *62 insanity" letter was equivocal.[2] The State's subsequent motion to foreclose presentation of that defense was granted. Although the judge perhaps could have done more to explore the feasibility of employing other remedies, we conclude that his decision was not so clearly unreasonable in light of the surrounding circumstances as to justify interference on the ground of an abuse of discretion.
Defendant's other contentions do not warrant extended discussion. As we have noted, defendant's argument that the confession should have been suppressed is wholly without merit. Defendant's objection to admission of his statement at trial was based upon entirely different grounds than those argued on appeal. The significance of an attorney's failure to timely raise an objection at the trial level was dealt with at length in State v. Macon, 57 N.J. 325 (1971). There, Chief Justice Weintraub pointed out that that under our practice, a trial error first raised on appeal "will not be dealt with as would be a timely challenge." Id., 57 N.J. at 333. One of the several reasons listed was that a reversal under such circumstances would reward the litigant who suffers an error for tactical advantage. Ibid. Also noted was the lack of "an opportunity to correct the error which would otherwise be afforded a trial judge." Ibid. The Chief Justice observed that "if upon a timely objection a different or further record might have been made at the trial level, and the claim of error might have been dissipated," the court will neither "reverse on an assumption that error exists nor remand the matter to explore that possibility." Ibid. Both reasons to deny appellate consideration are, in varying degrees, applicable here. At the trial level, defendant chose to attack the procedures employed by the police with *63 respect to his interrogation. The validity of defendant's arrest was never questioned. Further, it can hardly be argued that the trial judge was fully alerted to the issue belatedly perceived by appellate counsel. In any event, we are entirely satisfied that defendant's arrest was not unlawful and that his statement was properly admitted. Permission to enter the house was expressly granted by defendant's mother who possessed common, if not primary, authority over the premises. Any doubt that the consent of one who possesses common authority over property is valid against the nonconsenting person with whom that authority is shared was put to rest in United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). See also State v. Meighan, 173 N.J. Super. 440, 453 (App.Div. 1980) certif. den. 85 N.J. 122 (1980); State v. Miller, 159 N.J. Super. 552, 556-557 (App.Div. 1978) certif. den. 78 N.J. 329 (1978). We further note that the arrest did not occur in the house. Defendant was apprehended in the rear yard. And finally, we observe that any possible taint emanating out of the alleged unlawful arrest was surely attenuated by the time the statement was given. State v. Barry, 86 N.J. 80, 87 (1981).
Defendant's argument pertaining to the trial judge's evidentiary decisions are also totally devoid of merit. The victims' statements were properly admitted under the fresh complaint doctrine. See State v. Balles, 47 N.J. 331, 338 (1966), cert. den. and app. dism. 388 U.S. 461, 87 S.Ct. 2120, 18 L.Ed.2d 132, (1967); State v. Hummel, 132 N.J. Super. 412, 422 (App.Div. 1975) certif. den. 67 N.J. 102 (1975). The jury was given an appropriate limiting instruction. State v. Tirone, 64 N.J. 222, 226-227 (1974). So too, the officer's explanation with respect to the procedures applicable to interrogation of suspects was properly admitted and, in any event, could not have had the capacity to prejudice defendant's right to a fair trial.
Accordingly, the judgments of conviction are affirmed.
NOTES
[1] In a related context, we have held that the failure to move to suppress evidence prior to trial constitutes an effective waiver. See e.g., State v. Boyd, 165 N.J. Super. 304, 309 (App.Div. 1979) certif. den. 85 N.J. 128 (1980); State v. Anepete, 145 N.J. Super. 22, 25 (App.Div. 1976). Further, we have concluded that enforcement of the time requirements pertaining to motions to suppress does not offend due process standards. State v. Allaband, 134 N.J. Super. 353, 356 (App.Div. 1974); State v. Raymond, 95 N.J. Super. 175, 179 (App.Div. 1967), certif. den. 50 N.J. 296 (1967).
[2] The trial judge quoted from the letter as follows: "[s]ince I am not absolutely sure what the defense of this case will be, and since apparently from Doctor Clinton's evaluation and initial report there may well be a defense of insanity, I'm enclosing herewith a copy of the report of Dr. Lawrence Steiger."