278 N.J. Super. 249 (1994)
650 A.2d 1012
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
GERALD SCHER, DEFENDANT-APPELLANT/CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 1994.
Decided December 23, 1994.
*253 Before Judges GAULKIN, BAIME and ARIEL A. RODRIGUEZ.
Gerald L. Shargel, argued the cause for appellant/cross-respondent (Mr. Shargel and Vivian Shevitz, admitted pro hac vice, and Hellring, Lindeman, Goldstein & Siegal, attorneys; Richard D. Shapiro, on the brief).
John J. Scaliti, Assistant Bergen County Prosecutor, argued the cause for respondent/cross-appellant (John J. Fahy, Prosecutor, attorney).
The opinion of the court was delivered by BAIME, J.A.D.
Following a protracted trial, a jury found defendant guilty of reckless manslaughter (N.J.S.A. 2C:11-4b(1)), vehicular homicide (N.J.S.A. 2C:11-5), aggravated assault (N.J.S.A. 2C:12-1b(1)), and three counts of assault by auto (N.J.S.A. 2C:12-1c). In the same proceedings, the trial judge found defendant guilty of driving while intoxicated (N.J.S.A. 39:4-50), operating a motor vehicle while on the suspended list (N.J.S.A. 39:3-40), presenting a false license to a police officer (N.J.S.A. 39:3-38.1b), and driving a motor vehicle while unlicensed (N.J.S.A. 39:3-10). The trial judge merged the convictions for vehicular homicide, assault by auto, and driving while intoxicated. On the remaining convictions, the *254 trial judge imposed an aggregate sentence of seventeen years with an eight year parole ineligibility term. Defendant was fined $213,000.
On appeal, defendant argues that (1) he was denied an opportunity to exercise a peremptory challenge because a juror failed to disclose he was related to persons involved in law enforcement, (2) his conviction for reckless manslaughter should be reversed because the statute is vague, the evidence was insufficient, and the jury instructions were faulty, (3) the trial judge erred by failing to enter a judgment of acquittal on the aggravated assault count, (4) the trial judge abused his discretion when he barred a defense expert from testifying, and (5) the sentence is excessive. The State cross-appeals, challenging several of the trial judge's evidentiary decisions. The State also asks us to unmerge defendant's convictions for assault by auto.
While we find technical errors in the sentences imposed, we discern no basis to reverse defendant's convictions. On the cross-appeal, we reinstate defendant's convictions for assault by auto.

I.
The convictions arose out of an automobile accident in which a Mercedes Benz roadster driven by defendant traversed the grass median of the Palisades Interstate Parkway and collided with two oncoming vehicles. Wayne Commins, the driver of one of the automobiles, was killed instantly and others were seriously injured.
The facts were hotly disputed at trial. The State contended that defendant caused the accident by driving recklessly while intoxicated. Defendant claimed that he lost control of the Mercedes when it was struck by another car.
The State's proofs were substantial. In the early evening hours of May 11, 1990, defendant was observed driving a Mercedes roadster erratically in the southbound lanes of the Palisades Interstate Parkway. Arthur Lair, a motorist who was passed by *255 defendant, estimated that the Mercedes was traveling at 85 m.p.h. Others at the scene confirmed his account. According to Lair, defendant was driving in the left lane, flashing his headlights as a signal to let him pass. Lair testified that when a maroon "Japanese-type car" traveling in the left lane at approximately 55 m.p.h. did not move immediately to the slower lane, defendant attempted to pass on the right. Lair recounted that the maroon car simultaneously moved into the right lane, causing defendant to swerve the Mercedes into the entrance path leading to an Exxon gasoline station. As the Mercedes veered toward the gasoline pumps, defendant "jerked" the steering wheel to the left, causing the automobile to "fishtail" and swerve across the southbound lanes and the center median into oncoming traffic.
Alexander Arbit was traveling in one of the northbound lanes when he observed the Mercedes crossing the grass median at "tremendous speed." As Arbit watched in horror, the side of the Mercedes crashed into Commins' Mercury Lynx, sending it careening across the highway. The Mercedes then wildly gyrated, striking the front of Arbit's van.
Lair immediately pulled his car onto the shoulder to render assistance. He first encountered defendant, trapped in the front seat of the Mercedes. According to Lair, defendant was moaning incoherently and, at one point, claimed to be a New York sheriff's officer. Florence Hessen, defendant's fiancee and the owner of the Mercedes, was trapped in the passenger seat and also appeared to be seriously injured.
Police Officer John Elliott responded to the scene within minutes of the accident. Elliott first approached Commins in the front seat of the Mercury. Finding no vital signs, Elliott directed his attention to the van where he found Arbit and several passengers, all with substantial injuries. Elliott next proceeded to the Mercedes where he noticed the strong odor of alcohol on defendant's breath. Eventually, firefighters extricated defendant and Hessen from the Mercedes and transported them to the Hackensack Medical Center.
*256 Police Officer Paul Abbott was dispatched to the hospital where he found defendant in the emergency room. Abbott smelled alcohol on defendant's breath and noticed that his eyes were red and his skin was pale. Defendant told Abbott that the Mercedes had suddenly accelerated, causing him to lose control of the vehicle.
We briefly digress to note that defendant provided similar explanations of mechanical failure to others in the days immediately following the accident. In a conversation with Commins' brother, defendant said "there was some sort of physical deficiency with the car" and that there was a possibility the brakes had locked. Defendant offered essentially the same explanation to his insurance agent. Defendant also attributed the accident to a mechanical failure in an insurance claim form he signed approximately one month after the accident. In none of these accounts did defendant mention that the Mercedes was struck by another automobile.
While at the hospital, Abbott obtained two vials of defendant's blood. Tests performed at the State Police Laboratory revealed a.163 blood alcohol content. Emergency room personnel also took a blood sample which yielded an alcohol content of .175. Dr. Ram Setia, one of defendant's treating physicians, decided to postpone surgery for arterial bleeding because he was concerned defendant might react negatively to the mix of anesthesia and alcohol. Dr. Setia also testified that defendant was violent, "cursing and kicking at" medical and nursing personnel.
At trial, the State presented evidence indicating that an individual with a blood alcohol of .163 would be severely intoxicated and his reflexes, distance and depth perception, peripheral vision, and judgment and motor skills would be significantly impaired. It was estimated that a person having a.163 blood alcohol would be twenty five times more likely to be involved in a motor vehicle accident than if he were sober. The State's expert testified that a person of defendant's weight would have to drink a minimum of 33 ounces of wine in order for his blood alcohol to reach .163.
*257 Much of the State's evidence consisted of accident reconstruction testimony. We need not describe this evidence in detail. Through skid and yaw marks left by the Mercedes on the road and the median, investigators traced the car's path across the southbound and northbound lanes of traffic to the points of impact. Utilizing "drag" tests and computer models, the State's experts estimated that the Mercedes was traveling at 80 m.p.h. when it began its slide across the southbound lanes.
Defendant did not testify. However, he presented witnesses whose testimony differed markedly from the State's version of the incident. Hessen testified that she met defendant at his home in Alpine shortly before the accident. After consuming a cocktail, defendant dismissed his chauffeur and departed with Hessen in her car for a business meeting in Mountainside. Because Hessen had driven a substantial distance that afternoon, defendant agreed to drive. According to Hessen, defendant was traveling at approximately 62 m.p.h. when he attempted to pass a small red car that was proceeding slowly in the left lane. Hessen recounted that as defendant steered the Mercedes into the right lane the red automobile simultaneously moved in the same direction, "clipp[ing] the front left part of [Hessen's] car." Hessen then felt the Mercedes accelerate, "shimmying" and "rocking" back and forth as it crossed the southbound lanes and the center median.
The State presented evidence that at the hospital, Hessen mentioned to defendant's friend, Leslie Halle, she intended to tell the authorities she was driving the Mercedes at the time of the accident. Halle's wife testified that after her husband was subpoenaed by the State, a defense investigator, William Sewell, asked her to "influence" her husband not to testify. Sewell reminded Mrs. Halle that defendant had given her husband substantial amounts of money and had permitted him to say he worked for defendant's company when that was untrue.
The defense presented expert witnesses who challenged the accuracy of the State's blood test results. The defense also attacked the State's accident reconstruction evidence. We need *258 not describe these proofs in detail. Suffice it to say that much of the defense evidence was countered by the State's experts in rebuttal.

II.
We first consider defendant's argument that he was deprived of the opportunity to exercise a peremptory challenge during the voir dire because a juror failed to disclose his relationship with law enforcement officers. In his questions to the panel, the trial judge asked whether the prospective jurors had close friends or relatives involved in law enforcement. Jason Jenkins was not on the panel when that question was asked. When Jenkins was called and examined individually, he responded that he had not answered "yes" to any of the questions previously propounded. Jenkins was not challenged by either the prosecutor or the defense and ultimately served as a juror in the case.
During the trial the defense asked the judge to question Jenkins because he had been seen conversing with a police officer during a recess. Although that subject was not pursued further because defense counsel conceded the incident had "no significance or import," the judge asked Jenkins whether he and the juror seated next to him, Ronald Foley, had exchanged comments concerning the evidence. Foley had previously told the judge that he and Jenkins had made brief comments as the trial progressed, but that Jenkins had repeatedly directed him to refrain from making such remarks. Jenkins confirmed Foley's account. Neither the prosecutor nor the defendant sought to remove Jenkins from further service in the case.
The jury returned its verdict on Friday evening, August 7, 1992. On Monday morning, August 10, 1992, defendant's then New York counsel, Jacob Evseroff, appeared in court ostensibly to collect defense evidence and to discuss bail conditions with the prosecutor. Evseroff made no mention to the prosecutor of his intent to seek leave to interview jurors. However, Evseroff met ex parte with the trial judge that morning and requested permission to *259 have the jurors interviewed by a private investigator. Unfortunately, the transcript sheds little light on exactly what occurred at this meeting. It appears, however, that without requiring any documentary submissions, without the presence of the prosecutor, and without any reference to the requirements of R. 1:16-1, the trial judge granted defendant's request.
On Tuesday morning, August 11, 1992, defendant's New Jersey attorney, Martin Goldman, first learned of Evseroff's private meeting with the trial judge. In an ex parte conversation, the trial judge confirmed to Goldman that he had given Evseroff permission to interview jurors. The judge then directed that a written application be made and that no interviews were to take place without his permission.
Despite the judge's prohibition against interviewing jurors, defendant's investigator Sewell visited juror Marianne Capozzi at her home on Tuesday afternoon and again in the evening. Sewell also spoke to juror Stephen Scott that same day. In his interview with Capozzi, Sewell promised to obtain the "best divorce lawyer money could buy" for her boyfriend who was involved in a domestic relations case, if she agreed to "help him get a mistrial." Sewell indicated that he knew Capozzi and her boyfriend were "in a financial bind." Concerned that she had been offered a bribe, Capozzi contacted the trial judge.
The judge decided to question Capozzi. In her interview with the judge, Capozzi claimed that Jenkins had told her his father and brother were involved in law enforcement and he would have her arrested unless she acquiesced in a guilty verdict. She also claimed that Jenkins had mentioned to her and Stephen Scott that he had read a newspaper article which reported that defendant had a prior arrest for drunk driving and did not have a license at the time of the accident.
The trial judge subsequently questioned Jenkins and Scott. Jenkins revealed that he had learned after the jury voir dire that his "biological" father was associated with law enforcement. Jenkins noted that at the time of the jury voir dire, he believed his *260 father was employed in a management capacity at the Willowbrook mall. Jenkins explained that his father had abandoned the family when Jenkins was thirteen years old and that the two had a distant and strained relationship. Jenkins also revealed that his brother was an Englewood police detective. He noted, however, that at the time of the jury voir dire, his brother was on sick leave, about to undergo surgery which, it was predicted, would leave him partially paralyzed. Jenkins thus believed that his brother had severed his employment as a detective. Jenkins denied that he had ever threatened Capozzi, and added that he had neither read newspaper reports about defendant nor discussed such articles with Capozzi or Scott.
Scott's testimony corroborated Jenkins' account. Scott adamantly denied having spoken to Jenkins or Capozzi about newspaper reports of defendant's prior driving violations. Scott also denied any awareness of Jenkins' ties to law enforcement. He claimed that his discussions with Capozzi and Jenkins during jury deliberations related solely to the evidence presented.
The trial judge ordered the prosecutor to investigate the employment status of Jenkins' father and brother. The investigation revealed that Jenkins' father had commenced employment as an investigator for the Passaic County Prosecutor's Office on March 12, 1990. In addition, it was confirmed that Jenkins' brother was on sick leave from the Englewood Police Department at the time of the jury voir dire, that he subsequently underwent back surgery, and that he returned to active service after the trial was completed.
The trial judge denied defendant's motion for a new trial. In his oral opinion, the judge found untruthful much of Capozzi's testimony. The judge rejected Capozzi's factual assertions that Jenkins had read and discussed newspaper reports of defendant's driving record and that he had threatened her. The judge further concluded that at the time of the voir dire Jenkins was unaware of his father's employment with the Passaic County Prosecutor's Office, and that he honestly believed his brother would not return *261 to his position with the Englewood Police Department. The judge concluded that Jenkins' good faith errors in responding to questions in the voir dire did not warrant a new trial.

A.
Before addressing defendant's argument, we consider the State's contention that New York counsel's violation of R. 1:16-1 should bar the defense from impeaching the jury's verdict. R. 1:16-1 prohibits attorneys and their investigators from questioning jurors on any matter relating to the case "[e]xcept by leave of court granted on good cause shown." Ibid. The purpose of the rule is to "protect ... jurors against efforts of others to browse among their thoughts in search of something to invalidate their verdict" and to "insure free debate in cases to come." State v. LaFera, 42 N.J. 97, 106-07, 199 A.2d 630 (1964). It would be unfair to the public if jurors were led to believe "that they [could not] convict a man of means without risking an inquiry [into their private lives] by paid investigators, with, to boot, the distortions [investigations] of that kind can produce." Id. at 107, 199 A.2d 630.
The record clearly discloses that defendant's investigator flagrantly violated R. 1:16-1. We are convinced that Sewell's interviews with Capozzi and Scott occurred after the trial judge ordered that no inquiry of jurors take place without a written and formal application.
It does not follow, however, that the information Sewell gained should be automatically excluded. As we said in State v. Riley, 216 N.J. Super. 383, 523 A.2d 1089 (App.Div. 1987), "if a lawyer violates the rules he may subject himself to disciplinary proceedings but we know of no per se bar to the admissibility of information ... based upon the ethical violation." Id. at 390, 523 A.2d 1089. On the contrary, we have said in a variety of factual settings that "the sins or faults of an errant attorney should not [generally] be visited upon his client," Jansson v. Fairleigh Dickinson Univ., 198 N.J. Super. 190, 194, 486 A.2d 920 (App.Div. 1985), *262 and that "evidence obtained in violation of applicable disciplinary rules is [nonetheless] admissible." State v. Riley, 216 N.J. Super. at 390, 523 A.2d 1089 (citing State v. Darby, 211 N.J. Super. 367, 376, 511 A.2d 1222 (App.Div. 1986); Barbetta v. Sciaraffa, 135 N.J. Super. 488, 495, 343 A.2d 770 (App.Div. 1975); Suarez v. State, 481 So.2d 1201, 1205-07 (Fl.Sup.Ct. 1986), cert. denied, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986); State v. Morgan, 231 Kan. 472, 646 P.2d 1064, 1069-70 (1982); People v. Green, 405 Mich. 273, 274 N.W.2d 448 (1979)).
While we are deeply troubled by the defense's ethical lapses, we agree with the general principle stated in Riley that evidence obtained in violation of R. 1:16-1 should not automatically be excluded. This does not mean that the defense may launch a post-conviction investigation of the jury with impunity. We expect that the potential of disciplinary charges will deter those who might be inclined to violate our rules of ethics. Other sanctions are also available. As we will note later in this opinion, it is arguable that a more rigorous standard than that traditionally applied for granting a new trial should be used where counsel has deliberately flouted the rule's prohibition. At this posture, we merely hold that the defense's violation of R. 1:16-1 is not a per se bar to defendant's use of the evidence obtained.

B.
We begin our analysis by noting the importance of the peremptory challenge in the process of selecting a fair and impartial jury. Although peremptory challenges are not constitutionally mandated, Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759, 772 (1965); Stilson v. United States, 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154, 1156 (1919); Brown v. State, 62 N.J.L. 666, 678, 42 A. 811 (E. & A. 1899), aff'd, 175 U.S. 172, 20 S.Ct. 77, 44 L.Ed. 119 (1899), New Jersey has long acknowledged their significance through legislation and court rule. N.J.S.A. 2A:78-7(c); R. 1:8-3(d). "Our laws and rules are designed, albeit imperfectly, to assure the empaneling of a jury that, to the *263 greatest extent possible ... will reach its verdict solely on the evidence with complete fairness and impartiality." State v. Singletary, 80 N.J. 55, 80, 402 A.2d 203 (1979) (Handler, J., dissenting). Responses to questions on voir dire that indicate bias may result in a juror being excused for cause. Hints of bias short of that required for a challenge for cause may be combatted by exercise of a peremptory challenge.
Peremptory challenges have been an integral aspect of criminal trial procedure for over six hundred years and continue to be universally employed throughout the country. Swain v. Alabama, 380 U.S. at 212-19, 85 S.Ct. at 831-35, 13 L.Ed.2d at 768-72. The underlying thesis is that, with the exception of challenges for cause, the suitability of a particular juror is counsel's decision and not the court's. Pleva v. Gootzeit, 114 N.J.L. 399, 176 A. 706 (Sup.Ct.), aff'd, 115 N.J.L. 505, 181 A. 44 (E. & A. 1935). Consistent with that thesis and subject to constitutional strictures, see J.E.B. v. Alabama ex rel. T.B., ___ U.S. ___, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986), a peremptory challenge can rest on a good reason, a bad reason, or no reason at all.
In a series of decisions, our courts have invalidated judgments where a juror's inaccurate answer to a question propounded in the jury voir dire precluded a litigant from exercising a peremptory challenge. See Wright v. Bernstein, 23 N.J. 284, 129 A.2d 19 (1957); State v. Williams, 190 N.J. Super. 111, 462 A.2d 182 (App.Div. 1983); State v. Thompson, 142 N.J. Super. 274, 361 A.2d 104 (App.Div. 1976). In Wright v. Bernstein, 23 N.J. 284, 129 A.2d 19, for example, a prospective juror in the voir dire examination denied that any of his relatives were involved in litigation, although his mother had a pending action that was later tried while the jury was deliberating. Our Supreme Court reversed the judgment on the ground that the juror's mistaken response, though made in good faith, deprived counsel of the opportunity to exercise a peremptory challenge. Id. at 294-95, 129 A.2d 19. In *264 reaching this conclusion, the Court said "a party is not required to make an affirmative showing that the denial of his right to peremptory challenge [] resulted in prejudice...." Id. at 295, 129 A.2d 19.
In State v. Thompson, 142 N.J. Super. at 277, 361 A.2d 104, a juror in the voir dire failed to apprise the court and counsel he once had been a correctional officer. While we accepted the contention that the juror's erroneous response "was probably the result of misunderstanding," id. at 279, 361 A.2d 104, we reversed the judgment of conviction, stating that the key factor was whether defendant had been deprived of a fair trial by jury because of the juror's failure to give a candid response "to the inquiry relating to a significant fact of potential bias." Id. at 280, 361 A.2d 104.
Likewise, in State v. Williams, 190 N.J. Super. 111, 462 A.2d 182, we reversed a conviction where a prospective juror failed to reveal on a prequalification form that she had been convicted of a crime. Noting that the criminal conviction should have disqualified the juror from service, see N.J.S.A. 2A:69-1; N.J.S.A. 2A:78-6, we held that the defendant was entitled to a new trial notwithstanding his inability to show the juror was prejudiced against him. Id. at 116-17, 462 A.2d 182.
These principles were reaffirmed in In re Kozlov, 79 N.J. 232, 398 A.2d 882 (1979). There, the Court reiterated that "[w]here a juror on voir dire fails to disclose potentially prejudicial material ... a party may be regarded as having been denied a fair trial." Id. at 239, 398 A.2d 882. The Court explained that "[t]his is not necessarily because of any actual or provable prejudice to his case attributable to such juror, but rather because of his loss, by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge, thus assuring with maximum possible certainty that he be judged fairly by an impartial jury." Ibid.; see also State v. Deatore, 70 N.J. 100, 105-06, 358 A.2d 163 (1976).
*265 Our rule differs from its federal counterpart. The United States Supreme Court has held that "to obtain a new trial[,] a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equip. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663, 671 (1984); see also United States v. Ortiz, 942 F.2d 903, 909 (5th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 2966, 119 L.Ed.2d 587 (1992). The prosecutor in this case invites us to adopt the federal rule. We decline this invitation in light of our Supreme Court's opinion in In re Kozlov, 79 N.J. 232, 398 A.2d 882, which reaffirmed the principles enunciated in Wright v. Bernstein, 23 N.J. 284, 129 A.2d 19 (1957), and its progeny.
Candor requires us to note, however, that to invalidate the result of a protracted trial because of a juror's mistaken, though honest, response to a question is to insist upon something closer to perfection than perhaps our judicial system can be expected to give. See McDonough Power Equip. v. Greenwood, 464 U.S. at 555, 104 S.Ct. at 851, 78 L.Ed.2d at 671. Particularly where, as here, the prohibition against interviewing jurors has been deliberately violated, it might be appropriate to apply a more rigorous standard in determining whether a reversal is required. Perhaps in that situation, the defendant should be required to demonstrate that the juror concealed information going to the heart of his capacity to fairly decide the issues and that, "under the facts and circumstances surrounding the particular case, the juror was biased against the moving litigant." Id. at 558, 104 S.Ct. at 851, 78 L.Ed.2d at 672 (concurring opinion of J. Blackmun with whom J. Stevens and J. O'Connor joined). Many jurisdictions have adopted variants of this rule, see, e.g., Land & Assoc., Inc. v. Simmons, 562 So.2d 140, 148 (Ala. 1990), cert. denied, 499 U.S. 918, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991); Catchings v. City of Glendale, 154 Ariz. 420, 743 P.2d 400, 402-03 (Ct.App. 1987); Pineview Farms, Inc. v. A.O. Smith Harvestore, Inc., 298 Ark. 78, *266 765 S.W.2d 924, 929-30 (1989); In re Hitchings, 6 Cal.4th 97, 24 Cal. Rptr.2d 74, 86, 860 P.2d 466, 478, (1993); Harris v. United States, 606 A.2d 763, 766 n. 5 (D.C. 1992); Skiles v. Ryder Truck Lines, Inc., 267 So.2d 379, 380 (Fla. Dist. Ct. App. 1972), cert. denied, 275 So.2d 253 (Fla. 1973); Isaacs v. State, 259 Ga. 717, 386 S.E.2d 316, 335 (1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3297, 111 L.Ed.2d 805 (1990); State v. Tolman, 121 Idaho 899, 828 P.2d 1304, 1307 (1992); Pekelder v. Edgewater Automotive Co., Inc., 68 Ill.2d 136, 11 Ill.Dec. 292, 293, 368 N.E.2d 900, 901 (1977); Commonwealth v. Amirault, 399 Mass. 617, 506 N.E.2d 129, 135 (1987); Grover v. Minette-Mills, Inc., 638 A.2d 712, 715 (Me. 1994); Hunt v. C.H.A.D. Enter., Inc., 183 Mich. App. 59, 454 N.W.2d 188, 191 (1990); Brines by Harlan v. Cibis, 882 S.W.2d 138, 138-40 (Mo. 1994); Sathren v. Behm Propane, Inc., 444 N.W.2d 696, 697-98 (N.D. 1989); State v. Pierce, 109 N.M. 596, 788 P.2d 352, 356 (1990); People v. Leonti, 262 N.Y. 256, 186 N.E. 693, 694 (1933); Bagyi v. Miller, 3 Ohio App.2d 371, 32 O.O.2d 518, 210 N.E.2d 887, 892-93 (1965); Durant v. State, 717 P.2d 1161, 1163 (Okla. Crim. App. 1986); State v. Thomas, 777 P.2d 445, 450-51 (Utah 1989); and State v. Rempel, 53 Wash. App. 799, 770 P.2d 1058, 1060 (1989), rev'd on other grounds, 114 Wash.2d 77, 785 P.2d 1134 (1990).
We have no occasion to consider the question further. As we noted earlier, the reason for vitiating an otherwise valid judgment where a juror has failed to disclose material information is to protect a litigant's opportunity to exercise a peremptory challenge. "Once the jury is sworn, however, the law presumes that every juror in a case is indifferent and above legal exception, or otherwise he would have been challenged for cause." Wright v. Bernstein, 23 N.J. at 294, 129 A.2d 19. Our Supreme Court has said, "[t]his presumption puts a duty on a party to show that [he was] or would have been dissatisfied with the jury as finally impaneled, and that [he] would have exercised the right of additional peremptory challenges given [him] by statute if [he] w[as] aware of the true situation." Ibid. In Wright v. Bernstein, 23 N.J. 284, 129 A.2d 19, the Court expressed, "no doubt had the prospective juror *267 answered the inquiry truthfully, he would have been peremptorily challenged, if the [trial judge] overruled a challenge for cause." Id. at 294, 129 A.2d 19. Similarly, in State v. Thompson, 142 N.J. Super. at 280, 361 A.2d 104, we said "[u]ndoubtedly, if the information had been divulged, it is reasonable to assume that counsel for defendant would have challenged that juror on a peremptory basis if a challenge for cause was unsuccessful." And in State v. Williams, 190 N.J. Super. at 117, 462 A.2d 182, the juror's undisclosed conviction should have disqualified her from service and would have resulted in a challenge for cause had the information been divulged.
In contrast, the record here clearly belies the thesis that defendant would have exercised a peremptory challenge had he been aware of Jenkins' ties to law enforcement. Among the jurors accepted by defendant were one whose uncle had been a member of the Hackensack Police Department for thirty years, another whose closest friend was a Port Authority police officer, another whose friend was a New Jersey State Trooper, another whose uncle served as a detective in Elmwood Park, and another who was an auxiliary police officer for some twenty-five years. These jurors were acceptable to the defense despite their strong association with law enforcement and notwithstanding that defendant had four peremptory challenges remaining when he indicated to the trial judge he was satisfied with the jury.
We conclude that Jenkins' failure to disclose his father's and brother's relationship with law enforcement had no practical impact on the trial because the juror would not have been challenged had the information been known to the defendant. The true test is not whether Jenkins fully answered the questions put to him, but whether the defendant was denied a fair trial. Judgments are not reversed for every error that appears in the record. If this were so, few judgments, if any, would be permitted to stand. A criminal trial represents an important investment of private and social resources. It ill serves the interests of justice to reverse an otherwise valid conviction on a technical error having no practical *268 significance. We hold that Jenkins' nondisclosure was harmless and did not result in a miscarriage of justice.

III.
We reject defendant's argument that his conviction for reckless manslaughter must be reversed because the statute is vague, the evidence was insufficient, and the jury instructions were defective. Although phrased in a variety of ways, defendant's contentions raise the question of the appropriate offense or offenses to be charged when a criminal homicide results from operation of a motor vehicle.
The evolution of our statutes dealing with this subject was thoroughly discussed in State v. Jiminez, 257 N.J. Super. 567, 608 A.2d 996 (App.Div. 1992), and need not be repeated here. Suffice it to say that after our opinion was rendered in State v. Milligan, 202 N.J. Super. 336, 495 A.2d 132 (App.Div. 1985), aff'd, 104 N.J. 67, 514 A.2d 1316 (1986), holding that a person could not be charged with both reckless manslaughter and death by auto, the Legislature abrogated our decision by amending N.J.S.A. 2C:11-5. See L. 1988, c. 75 § 1. As amended, N.J.S.A. 2C:11-5d provides that both offenses may be charged and that death by auto is a lesser-included offense of reckless manslaughter.
In State v. Jiminez, 257 N.J. Super. 567, 608 A.2d 996, we concluded, consistent with Justice Clifford's dissent in Milligan, that "to establish reckless manslaughter, proof [is] required of `acts of recklessness in addition to defendant's reckless driving of his automobile.'" Id. at 576, 608 A.2d 996. We adopted Justice Clifford's statement that reckless manslaughter encompasses reckless conduct "`quantitatively greater than the recklessness contemplated in a death-by-auto charge and qualitatively less than the recklessness required to support an aggravated manslaughter case.'" Ibid. (quoting State v. Milligan, 104 N.J. 67, 73, 514 A.2d 1316 (1986)).
*269 The instructions given by the trial judge fully comported with our decision in Jiminez. However, this case has the added gloss of driving while intoxicated. The death by auto statute provides for a minimum sentence of 270 days imprisonment or community service where the defendant is found to have been driving under the influence of alcohol when he committed the offense. See N.J.S.A. 2C:11-5b. In his dissenting opinion in Milligan, Justice Clifford was concerned that the death by auto statute manifested "a legislative intent to limit the role of drinking so as to foreclose consideration of it as an additional item of evidence that would serve to distinguish a manslaughter prosecution from a death by auto case." State v. Milligan, 104 N.J. at 78 n. 2, 514 A.2d 1316. The Justice thus suggested that drinking may constitute an additional act of recklessness to raise a death by auto charge to reckless manslaughter if the circumstances surrounding the drinking had "extraordinary characteristics." Ibid.
The trial judge thus added language to his instructions, embracing Justice Clifford's view of the role of drinking as an additional item of evidence. We quote the trial judge's instructions on the subject in their entirety.
Now each of these two charges, reckless manslaughter and death by automobile has an element: Recklessness. I'm going to differentiate for you now between the reckless manslaughter statute and the death by automobile statute. Standing alone the reckless driving of an automobile which results in the death of another person satisfies all of the requirements for a violation of the death by automobile statute provided you are so convinced beyond a reasonable doubt. A reckless manslaughter conviction on the other hand must be based on proof beyond a reasonable doubt that the defendant engaged in additional acts of death causative recklessness beyond the mere driving of an automobile in a reckless manner. The State alleges that these acts were among other acts his driving [sic] before the accident. Because the death by automobile statute already contemplates driving under the influence of alcohol within its scope, to constitute reckless manslaughter the drinking required to be proved by the State if drinking is the additional act of death causative recklessness would have to have extraordinary characteristics. That is, that drinking would have to be more than causal [sic] drinking and more than mere intoxication, rather, it would have to be exceptional drinking to a marked extent. To prove reckless manslaughter the State has to prove beyond a reasonable doubt that Mr. Scher's acts before he got into the automobile if drinking was so extraordinary and extreme and if any other acts were so extreme as to render his predriving behavior reckless, as I have defined that term for you, in *270 order to find Mr. Scher guilty of reckless manslaughter you must find beyond a reasonable doubt that this reckless behavior was death causative; that it was different in kind from although not necessarily worse than that involved in reckless driving. This additional act of recklessness must be in addition to the recklessness in the operation of his vehicle which the State says resulted in the death of Wayne Commins. This is not to say that someone guilty of reckless manslaughter may not have been driving recklessly as well so as to satisfy the requirements of death by auto, but to find a person guilty of reckless manslaughter where an automobile is involved this must be acts of recklessness separate and apart from and in addition to the manner of driving the automobile and these acts of recklessness must have been a cause of the victim's death.
On three occasions, at the jury's request, the trial judge repeated the distinction between reckless manslaughter and death by auto. Pursuant to defense counsel's suggestion, the judge invited the jury to submit a more specific question apprising him and counsel of the particular issue that was causing difficulty. The jury then requested a definition of "casual drinking." In response, the trial judge declined to define the term with greater particularity and told the jury to rely on its "good common sense" and its "understanding of the English language." The verdict was returned shortly thereafter.
We are satisfied that the reckless manslaughter statute, as applied in vehicular homicide cases, is not "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application...." Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). Defendant "was reasonably apprised, as a matter of common intelligence, in light of ordinary human experience, that his particular conduct was unlawful." State v. Lashinsky, 81 N.J. 1, 18, 404 A.2d 1121 (1979); see also Town Tobacconist v. Kimmelman, 94 N.J. 85, 118, 462 A.2d 573 (1983). Further, the statute, as construed in Jiminez, provides officials with guidelines sufficient to prevent arbitrary and erratic enforcement. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115 (1972).
We are also satisfied that the evidence was sufficient to convict. We see no need to describe in detail the aggravating *271 features that raised the crime committed from death by auto to reckless manslaughter. Defendant's extraordinary inebriation, his foolhardy decision to dismiss his chauffeur and drive, and the excessive speed and the daredevil manner in which he operated the Mercedes were circumstances sufficient to support a conviction for reckless manslaughter. Consideration of these factors separately, which is defendant's thesis here, may be insufficient in itself to elevate death by auto to reckless manslaughter. However, when a combination of the factors exist, the test has been met. It is enough to say that the record fairly shrieks of defendant's guilt.
We have already stated that the trial judge's instructions conveyed the applicable legal principles. We add that defendant expressed his general satisfaction with the judge's principal charge and cannot now condemn the very principles he urged, claiming them to be error and prejudicial. State v. Ramseur, 106 N.J. 123, 282, 524 A.2d 188 (1987) (quoting State v. Pontery, 19 N.J. 457, 471, 117 A.2d 473 (1955)), cert. denied, ___ U.S. ___, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). See also State v. Harper, 128 N.J. Super. 270, 277, 319 A.2d 771 (App.Div.), certif. denied, 65 N.J. 574, 325 A.2d 708 (1974). We acknowledge that the jury had difficulty applying the trial judge's instructions. The trial judge was thus obligated "to clear the confusion." State v. Conway, 193 N.J. Super. 133, 157, 472 A.2d 588 (App.Div.), certif. denied, 97 N.J. 651, 483 A.2d 174, and 97 N.J. 650, 483 A.2d 174 (1984); see also State v. Parsons, 270 N.J. Super. 213, 221, 636 A.2d 1077 (App.Div. 1994). We cannot fairly say that the trial judge abused his discretion by repeating the instructions previously given. We can think of no more meaningful way to apprise the jury of the applicable legal principles than the terminology used in the trial judge's instructions.

IV.
At the conclusion of the State's case, the trial judge entered a judgment of acquittal on the charge of aggravated *272 manslaughter, finding that the prosecution's evidence was insufficient to establish "circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4a. Because "circumstances manifesting extreme indifference to the value of human life" constitute an element of aggravated assault when accompanied by reckless conduct under N.J.S.A. 2C:12-1b(1), defendant contends that the trial judge was bound to dismiss that charge as well. We disagree.
The predicate to defendant's contention is that the trial judge correctly reduced the offense charged from aggravated manslaughter to reckless manslaughter. We reject that thesis. It is at least arguable that driving an automobile on a super-highway in an extremely reckless fashion, at an excessive rate of speed, and while highly inebriated creates a "probability, rather than a possibility, that death [will] result...." State v. Bowens, 108 N.J. 622, 638, 532 A.2d 215 (1987). A cogent argument can thus be made that defendant's conduct suggested a level of indifference sufficient to warrant submission of that question to the jury and that the trial judge erred by reducing the aggravated manslaughter charge. See State v. Curtis, 195 N.J. Super. 354, 479 A.2d 425 (App.Div.), certif. denied, 99 N.J. 212, 491 A.2d 708 (1984).
In any event, "circumstances manifesting extreme indifference to the value of human life," as an element of aggravated assault, "entail a probability of serious bodily injury." State v. Oriole, 243 N.J. Super. 688, 693, 581 A.2d 142 (Law Div. 1990). This differs from a probability of death resulting from the defendant's conduct, as required for a conviction of aggravated manslaughter.

V.
The trial judge did not abuse his discretion by barring defense expert Nicholas Pucino from testifying regarding facts and theories wholly foreign to the report he co-signed and submitted to the prosecutor prior to trial. While the sanction of preclusion is a drastic remedy and should be applied only after other alternatives are fully explored, State v. Williams, 214 N.J. Super. *273 12, 22, 518 A.2d 234 (App.Div. 1986); State v. Utsch, 184 N.J. Super. 575, 580, 446 A.2d 1236 (App.Div. 1982); State v. Volpone, 150 N.J. Super. 524, 529, 376 A.2d 199 (App.Div. 1977); State v. Moore, 147 N.J. Super. 47, 51, 370 A.2d 531 (App.Div. 1977); State v. Nunn, 113 N.J. Super. 161, 168-69, 273 A.2d 366 (App.Div. 1971), the defense's dereliction was particularly egregious and no course other than preclusion would have preserved the State's right to a fair trial. See State v. Burnett, 198 N.J. Super. 53, 60-61, 486 A.2d 846 (App.Div. 1984).

VI.
We agree with defendant's argument that the trial judge improperly considered as aggravating factors the reckless nature in which the crimes were committed, N.J.S.A. 2C:44-1a(1), and the gravity and seriousness of the harm inflicted on the victims, N.J.S.A. 2C:44-1a(2). These were elements of the crimes for which defendant was convicted and should not have been double-counted. See State v. Jarbath, 114 N.J. 394, 404, 555 A.2d 559 (1989); State v. Gardner, 113 N.J. 510, 519, 551 A.2d 981 (1989); State v. Mara, 253 N.J. Super. 204, 215, 601 A.2d 718 (App.Div. 1992); State v. Towey, 244 N.J. Super. 582, 593, 583 A.2d 352 (App.Div.), certif. denied, 122 N.J. 159, 584 A.2d 226 (1990); State v. Link, 197 N.J. Super. 615, 620, 485 A.2d 1069 (App.Div. 1984), certif. denied, 101 N.J. 234, 501 A.2d 911 (1985).
We nevertheless perceive no basis to disturb the quantum of the sentences imposed or the parole ineligibility terms set. Our sentencing statutes were designed to channel judicial discretion. They contemplate a thoughtful weighing of aggravating and mitigating factors, not a mere counting of one against the other. Here, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1a(3), and the need for specific and general deterrence, N.J.S.A. 2C:44-1a(9), demand paramountcy over all other considerations. This was not defendant's first brush with the law. Defendant has thrice been convicted of drunk driving. He was *274 previously involved in a high speed collision in which his drunk driving resulted in serious injuries.
Defendant seeks to mitigate his record of prior delinquency by suggesting that alcoholism is a disease and not a moral shortcoming. We leave moral judgments to the philosophers. Our object is to protect the innocent from injury by the sick as well as the bad. Given that purpose, we find the sentences appropriate.

VII.
The trial judge imposed an illegal one year sentence on the conviction for driving a motor vehicle while under suspension. The maximum sentence is imprisonment for ninety days. N.J.S.A. 39:3-40.
The trial judge also erred by merging the convictions for assault by auto. See State v. Lewis, 223 N.J. Super. 145, 152, 538 A.2d 399 (App.Div.), certif. denied, 111 N.J. 584, 546 A.2d 510 (1988); see also State v. Craig, 237 N.J. Super. 407, 568 A.2d 100 (App.Div. 1989), certif. denied, 121 N.J. 662, 583 A.2d 348 (1990). Each conviction involved a different victim.
We invoke our original jurisdiction pursuant to R. 2:10-5 and impose a sentence of six months on each of the three convictions for assault by auto, to run concurrent with the sentences imposed on the convictions for reckless manslaughter and aggravated assault. We also impose a concurrent sentence of ninety days for the violation of N.J.S.A. 39:3-40.
The convictions are affirmed and the matter is remanded for modification of the judgment.